In re ASSOCIATED GAS & ELECTRIC CO.

District Court, S. D. New York.
July 30, 1943.

108

See, also, 53 F.Supp. 118.

Stanley Clarke, of New York City (Samuel J. Silverman, William T. Holmes, and James R. Flynn, all of New York City, of counsel), for trustee of debtor.

Allen E. Throop and O. John Rogge, both of New York City (William W. Golub, of New York City, of counsel), for Trustees of Associated Gas & Electric Corporation.

Jack Lewis Kraus, II, of New York City (Harry B. Kurzrok, of New York City, of counsel), for General Protective Committee.

Kelsey, Waldrop & Spalding, of New York City (H. Boardman Spalding, of New York City, of counsel), for Colonial Trust Co., etc.

Davies, Auerbach, Cornell & Hardy, of New York City (H. C. McCollom and H. A. Heerwagen, both of New York City, of counsel), for Jacob Committee for unsurrendered CDCs.

Joseph Nemerov and Leo B. Mittelman, both of New York City, for the Baker Committee.

Abraham Mitnovetz, of New York City, for Elias Committee for Holders of Convertible Obligations due 2002.

Nathan D. Shapiro, of Brooklyn, N. Y., for Kelby Committee.

Boehm & Fischman, of New York City, for Scrip Holders Protective Committee.

Geist & Netter, of New York City, for Scrip Holders.

Thomas M. Losie, of Elmira, N. Y., for Greven Claimants.

LEIBELL, District Judge.

On October 22, 1942, I signed an order appointing Hon. Frederick E. Crane as Special Master to pass upon certain classes of claims (see Appendix A), to which objections had been filed. These claims were based upon different types of convertible debenture certificates, convertible obligations, and interest and non-interest bearing certificates of the Debtor (Ageco). The Debtor also had outstanding fixed interest bonds (not included in these claims). The main issue submitted to the Special Master was whether the claims filed were subordinate to the fixed interest bonds of the Debtor.

On March 30, 1943, the Master made his report herein together with Findings of Fact and Conclusions of Law. Some of the claimants, as well as those objecting to the claims, filed objections to certain findings of fact and conclusions of law. The Master divided his findings and conclusions into three separate parts. There were grouped in one part fifty-eight findings of fact and eight conclusions of law dealing with the "Classification of the Claims of Convertible Debenture Certificates, Convertible Debenture Obligations, Convertible Certificates, Convertible Obligations Without Fixed Maturity, Convertible Obligations Series A and B, Due 2002, Interest and Non-Interest Bearing Scrip due 1941, 1942, 1944 and 1947 and Others." The second group of findings and conclusions (thirteen findings of fact and two conclusions of law) dealt with "Claims of Convertible Debenture Certificates Convertible into Class A Stock, due November 1, 1999, and Others". The third group disposed of "Claims of $8 Interest Bearing Allotment Certificates and $1.60 Interest Bearing Allotment Certificates, and others" on which the Master made twenty-nine findings of fact and four conclusions of law. There were no objections filed to these last two sets of findings and conclusions and no one appeared to oppose them orally at the Court hearing held on April 14th. I feel, however, that I should state briefly the factual basis for the claims considered and determined in these two sets of findings of fact and conclusions of law.

*Convertible Debenture Certificates Convertible Into Class A Stock Due November 1, 1999.*

■ These certificates (known as the ODC's of 1999) were a security whereby Ageco promised to pay a fixed principal sum on November 1, 1999, and to pay

quarterly interest thereon. They contained an option or right on the part of Ageco to convert them into Class A stock. The right was absolute and unconditional and it was exercised by Ageco in 1932. Claims were filed by the holders of certain of these certificates, who had not surrendered them for exchange. The trustee and a committee filed objections thereto. No one appeared before the Master in support of the claims.

There is evidence to support the Master's findings of fact (Nos. 1 to 13); they are not clearly erroneous, and I therefore accept and adopt them. Rule 53(e) (2), F.R.C.P., 28 U.S.C.A. following section 723c. His two conclusions of law, based on the findings, are as follows:

"1. By exercise of Ageco's option to convert, all CDC's of 1999 were validly converted into Class A Stock of Ageco, and such conversion cannot be set aside.

"2. Holders of the CDC's of 1999 and holders of Class A Stock obtained in exchange for said CDC's of 1999 should be classified as Class A stockholders, and not as creditors."

A decree should be entered accordingly, as to this set of claims.

### Claims of the $8 Interest Bearing Allotment Certificates and the $1.60 Interest Bearing Allotment Certificates.

These certificates (referred to as $8 IBAC's and $1.60 IBAC's) had no principal amount, no maturity and no promise to pay any sum except interest. By their terms Ageco had the option or right to exchange them into common stock of General Gas and Electric Corporation (Gengas) and preferred stock and optional stock purchase warrants of Ageco. In 1932 Ageco exercised that option and also gave the holders of the IBAC's certain additional options. Many IBAC holders surrendered their certificates and received either the equivalent securities specified in the exchange provisions of the IBAC's, or the securities specified in Ageco's optional exchange offer. In November 1935, in order to provide for those IBAC holders who had not surrendered their certificates (9,015 of the $8 IBAC's and 7,070 of the $1.60 IBAC's) Ageco deposited with Transfer and Coupon Paying Agency (Traco) as escrow agent, under an irrevocable escrow agreement, the equivalent securities to which those IBAC holders were entitled under the option exer-

cised by Ageco. The securities remaining with the agent under the escrow agreement have been turned over to the Ageco trustee and he is ready and able, upon an order of this Court, to deliver to the registered holders of the IBAC's (Finding No. 29) their respective shares of the escrowed securities.

As to this set of claims, the Master has made twenty-nine findings of fact, all of which I accept and adopt under the rule. He also made the following conclusions of law, which are a natural consequence of the findings:

"1. By the exercise of the Debtor's right to exchange, all $8 IBAC's and $1.60 IBAC's were validly converted into the following securities on the following bases:

"For each $8 IBAC:

"5 shares of Common Stock, Class A, of Gengas,

"1/2 share of $5 Dividend Series Preferred Stock, and 5 Optional Stock Purchase Warrants of the Debtor.

"For each $1.60 IBAC:

"1 share of Common Stock, Class A, of Gengas,

"1/10 shares of $5 Dividend Series Preferred Stock, and 1 Optional Stock Purchase Warrant of the Debtor.

"2. The holders of the $8 IBAC's and $1.60 IBAC's are entitled to receive, out of the securities deposited under the Escrow Agreement of November 27, 1935, the shares of Common, Class A, stock of Gengas on the bases set forth in Conclusion of Law 1 hereof.

"3. Said holders of the $8 IBAC's and $1.60 IBAC's should be classified as holders of $5 Dividend Series Preferred Stock of the debtor on the bases set forth in Conclusion of Law 1 and have the same, but no greater, right as the holders of such $5 dividend Series Preferred Stock have to participation in any reorganization or liquidation of the Debtor.

"4. Holders of other securities of the Debtor which they obtained in exchange for $8 IBAC's or $1.60 IBAC's in accordance with the optional exchange offers referred to in Findings 7 and 16 hereof should be classified as the holders of such other securities and such exchanges may not be set aside."

A decree in accordance with these conclusions should be entered in respect to this set of claims.

*Claims of Convertible Debenture Certificates, Convertible Debenture Obligations, Convertible Certificates, Convertible Obligations Without Fixed Maturity, Convertible Obligations Series A and B, Due 2002, Interest and Non-Interest Bearing Scrip Due 1941, 1942, 1944 and 1947, and Others.*

Going back now to the first set of findings of fact and conclusions of law, relating to this group of claims, the trustees moved to confirm the Special Master's report, only insofar as his findings of fact and conclusions of law concerned the rights of claimants, determined by Conclusions of Law 5 and 6, which read as follows:

"5. Persons who do not hold COAB's or stock, issued to such persons in exchange for CDC's, CC's or Old CO's, have no right of rescission of such exchange, whether or not their transferor or any other person may have had such rights.

"6. The subordination provisions contained in the certificates for CC's, Old CO's, COAB's, IB and NIB Scrip are valid and enforceable agreements subordinating such securities, both as to principal and interest, to the unsubordinated senior obligations of Ageco, being the unsubordinated indebtedness of Ageco except obligations convertible at Ageco's option into stock. The holders of CC's, Old CO's, COAB's, IB and NIB Scrip are therefore not entitled to participate in the reorganization or liquidation of Ageco until and unless such senior obligations have been paid in full."

[The abbreviated designations of the various types of securities follow the first letters of their descriptive names in the above heading.]

The claimants covered by conclusions of law 5 and 6 do not participate in the corporate assets under a proposed settlement of certain litigation, known as the Recap litigation, of which more will be said later. The rights of the other claimants in this first set were determined by the Special Master's conclusions of law 1, 2, 3, 4, 7, 8a and 8b (see Appendix B) but they are not now considered for reasons which will soon appear.

It was urged by the trustee at the Court hearing on the Master's report in April that I should hear argument and receive briefs at this time only on conclusions of law 5 and 6 and the findings of fact upon which they are based, and that I should postpone the consideration of the issues in respect to the other claims involved in this first set of claims, because of the pendency before the Master (under another order of reference) of a proposal to compromise the Recap litigation and its related issues, which would take care of those other claims.

I had referred to the Special Master (Judge Crane) by an order dated November 13, 1942, still another development in this matter, namely, the issues raised regarding the fairness of a proposed compromise of the controversy (the Recap litigation) existing between the estates of the respective debtors, (Ageco and Agecorp), and among the different classes of the security holders and the creditors of said estates, for the settlement of which the trustees of both estates had drawn and submitted to the Court a detailed proposal of compromise. By the order of November 13, 1942, the Master was asked to report upon the fairness of the proposed compromise, together with his findings of fact and conclusions of law. That report was made public July 22, 1943, but the findings and conclusions have not as yet been signed or filed.

The Special Master in his report of March 30, 1943, concerning the claims that had been referred to him by the order of October 27, 1942, stated in his concluding paragraph: "I desire to say this in closing: There is pending a question of settlement which has been referred to me and is coming up later. Some of the questions of law which I have passed upon here may be debatable. I have given my views, but there is room of course, as is so frequently the case, for a difference of opinion. For instance, after the notice of conversion into Preferred Stock sent to the CDC holders the Associated Gas and Electric Company carried them on its books as holders of CO's and did so for two years. It then changed entries to what they should have been in the first instance, Preferred Stockholders. I have not referred to the evidence in full, merely stating sufficient to justify my conclusion that there was a conversion. I mentioned this fact of book entries merely to indicate that there is also evidence for at least an argument the other way. Whether or not, for various reasons which may appeal to the Trustees or the creditors, a settlement should be made with some of these claim-

ants to avoid continued litigation of course I cannot say, especially as to the original CDC holders and original holders of Convertible Obligations taken in exchange. Such consideration must be left to others and to another time and place."

On July 22, 1943, the trustees released to the press a statement to the effect that the Special Master had approved their plan of compromise of the Recap litigation and that he considered the proposed compromise fair and reasonable and in every way desirable. The aforementioned plan of compromise (annexed to the order of reference dated November 13, 1942) deals in paragraph II, item 7 thereof, with unsurrendered Convertible Debenture Certificates, and in paragraph 8 thereof with Convertible Obligations, due 2002, Series A and Series B, which had been issued in exchange for securities enumerated in item 7 and which remained in the hands of the persons to whom originally issued, or their personal representatives, legatees or distributees.

Still another development in this matter occurred on June 14, 1943, when the trustees of Ageco and Agecorp filed with the Securities and Exchange Commission an application pursuant to Section 11(f) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79k(f), for the approval of a plan of reorganization of Ageco and Agecorp, the debtors seeking reorganization in this Court under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq. The plan of reorganization, among other things, gives effect to the terms of the plan of compromise of the Recap litigation hereinabove mentioned. The plan of compromise appears to be the backbone of the reorganization setup. On June 30th the Commission made an order directing that a hearing on the proposed plan be held August 23, 1943, before one of the designated officers of the Commission and that notice of the said hearing be given to all known security holders of Ageco and Agecorp.

In view of the present status of the reference on the plan to compromise the Recap litigation and the status of the plan for the reorganization of the two debtor corporations, it appears to me to be proper to consider at this time only the two conclusions of law Nos. 5 and 6 in connection with the first set of claims herein and the findings of fact relating to said conclusions, to wit, findings of fact 13, 22, 36, and 43 to 54 inclusive. The claims therein considered and determined are not given any recognition in the proposal of compromise or the plan of reorganization. Since it appears that the other claims of the first set of claims will be taken care of by the settlement, if it is finally approved, there is no need to pass now upon their legal merits. In fact, to do so might upset the fundamental basis of the settlement, which recognizes' that there are two sides to the questions presented. A final judicial determination would fix rights, instead of settling or adjusting them. A fair compromise will put an end to all this litigation and result in an early reorganization of the two debtor corporations, Ageco and Agecorp. A plan of reorganization is the goal towards which these proceedings have been advancing.

Exceptions were filed by certain of the claimants to findings of fact 13, 43, 44 and 50. These exceptions (objections) are overruled. The Court accepts and adopts findings of fact 13, 22, 36, and 43 to 54 inclusive. They are set forth in Appendix C.

These findings of fact fully support conclusions of law 5 and 6 (hereinbefore quoted) with which I agree.

The questions of law presented by the conclusions drawn by the Special Master from the aforementioned findings of fact are as follows:

"1. Does the transfer of a security carry with it the assignor's right to bring a rescission action against the issuer of the security in the absence of express language in the instrument of assignment transferring such right of rescission?

"2. Are provisions in corporate debt instruments, subordinating the securities both in respect of principal and interest to the general debt of the corporation, valid and enforceable agreements in bankruptcy?"

▮ Conclusion of law No. 5 applies to holders of COAB's who did not obtain their securities directly in exchange for CDC's—and to holders of IB and NIB scrip (no matter how acquired) for reasons hereinafter stated. The question is: Have such holders a right of rescission? The Special Master held that they have not. Assuming that the original holders of these COAB's had a valid claim for a rescission of the exchange, based upon facts showing that the exchange was un-

lawful for any reason, nevertheless the form of the assignment of the COAB's certificate, executed by the original holder to his transferee, was not such as would carry with it any right to the transferee to rescind the exchange. The form of assignment appears in finding of fact No. 46. See Appendix C.

The rights of an assignee depend, in the first instance, on the scope of the assignment; the language thereof must be our guide in marking the limits of the assignee's rights. All that was assigned therein was "the within Convertible Obligation of Associated Gas and Electric Company", according to the endorsed assignment.

A printed copy of the resolutions of the Ageco Board of Directors creating the COAB's (April 19, 1932) was stipulated as an exhibit before the Master on this reference. It is entitled "Associated Gas and Electric Company—Convertible Obligations of 1932—Resolutions of Board of Directors". The opening sentence states: "Resolved (1), that the Company, in order to obtain funds for its proper corporate purpose, does hereby authorize and create an issue of its obligations, to be known generally as its 'Convertible Obligations of 1932' * * *". There is nothing in this resolution that refers to the issuance of any of these COAB's in effecting an exchange for CDC's. The resolution was filed with the Registrar, the Public National Bank & Trust Company and is referred to in the COAB certificates issued pursuant to the resolution.

■ Ageco is a New York corporation. The resolution authorizing the issuance of the COAB's was passed at a Directors' meeting held in New York City. The claimants here are all registered holders of COAB's. The registrar was the Public National Bank & Trust Company of New York City. The registration took place here. The transfer agent was Transfer & Coupon Paying Agency (Traco) of New York City. The back of a COAB certificate stated: "This obligation is transferable and exchangeable, as provided above, at the office of the Transfer Agent in the Borough of Manhattan, City of New York." There is nothing in the record to show from whom the claimants acquired the COAB's, later registered in the claimant-holder's name, or where the actual assignment was made, if the COAB was ac-

quired by assignment. Apparently the reference proceeded on the assumption that the assignments were made in New York. In determining the effect of the assignment the law of New York governs. Manufacturers Trust Co. v. Kelby, 2 Cir., 125 F.2d 650, at page 652.

In Abel v. Paterno, 245 App.Div. 285, 281 N.Y.S. 58, it was held that assignees of stock in a cooperative apartment corporation and of a proprietary lease of an apartment therein could not recover in an action for a fraudulent representation made to their assignor, at the time the assignor acquired the stock and lease, as to the acreage on which the apartment was erected, because the respondents (the contractors who owned the land, built the apartment house, and sold the cooperative interests therein) "were not answerable to purchasers on resales", even though the assignor, the original holder of the stock, was entitled to damages for deceit. The extent to which an assignor may assign certain rights or causes of action and retain others is strikingly illustrated in Continuous Zinc Furnace Co. v. American Smelting & Refining Co., 2 Cir., 61 F.2d 958.

That an assignee of a stock certificate should not, by a bare assignment of the certificate, obtain any claim or causes of action accruing to his assignor out of the transaction by which the assignor originally acquired the certificate, is strongly supported by the practice of a sale by the assignor of his certificate for the purpose of fixing his damages preparatory to bringing an action for fraud or deceit.

This is not a case where a trustee may be held to made restitution to the trust by a holder of a certificate evidencing a participating interest in the trust, even though he acquired the certificate after the misappropriation of the trust res by the trustee. Manufacturers Trust Co. v. Kelby, 2 Cir., 125 F.2d 650. The facts here are not even as strong as those in Hendry v. Title Guarantee & Trust Co., 255 App. Div. 497, 8 N.Y.S.2d 164, 167, where one who acquired from a title company a participation certificate in a mortgage, after certain acts of the company (releasing to the mortgagor an award in a condemnation proceeding) had resulted in a diminution of the security covered by the mortgage, was denied a recovery. "The cause of action for that breach of trust did not

pass from hand to hand with the certificate".

The COAB's were regular and valid securities. One claimant argues that they are invalid because they contain "illusory promises". They are binding on the corporation issuer, Ageco. Their provisions were clear and not illusory. Some of the COAB's were sold direct from the treasury. The real attack on their legality is based on the exercise by Ageco of a right of conversion it had under the terms of other securities, the CDC's for instance, pursuant to which Ageco issued some of these new securities, COAB's, in effecting an exchange of the CDC's. However, a later purchaser of one of these new securities, COAB's, would have no right to go behind the security itself and ask that the exchange be undone and that he be given the old security, the CDC, which a prior owner surrendered after the option to make the exchange was exercised by Ageco. I think that this is true, whether the alleged illegality of the exchange be a lack of power under the option, any irregularity in its exercise, or any fraud by which the holder of the CDC was persuaded to deliver it in exchange for a COAB certificate. The right to a remedy for any of these wrongs belonged to the holder of the CDC certificate which contained the option and which was surrendered when the COAB certificate was issued.

IB and NIB scrip were issued as interest to holders of COAB's, about four years after 1932, when Ageco exercised its option to convert CDC's and offered COAB's to holders of CDC's, as an additional exchange privilege. The IB and NIB scrip was a different security from the COAB. A holder of a COAB certificate, on the receipt of IB or NIB scrip as interest on the COAB, could dispose of that scrip and still hold his COAB certificate; or he could hold the scrip and sell the certificate. There was no such connection, physical or legal, between the two, after a holder possessed both, that rights and remedies under one were inseparably bound to the other. It therefore follows that even if we assume a right of rescission, incidental to the ownership of a COAB, that right would not spread over to and become an incident of the IB or NIB scrip, received as interest on the COAB.

The subordination provisions of the COAB's, CC's, Old CO's and IB and NIB scrip are valid and enforceable. Those of the COAB's are set forth fully in finding of fact No. 43. As stated in findings of fact Nos. 13 and 50, substantially identical subordination provisions are contained in the CC's, the Old CO's, the IB scrip and the NIB scrip.

Subordination agreements, affecting the rights of the holders of certain types of securities in assets of the issuer, are enforceable in bankruptcy. True, Section 65, sub. a, of the Bankruptcy Act, 11 U.S.C.A. § 105, sub. a, provides:

"§ 105. Declaration and payments of dividends

"a. Dividends of an equal per centum shall be declared and paid on all allowed claims, except such as have priority or are secured."

But agreements for subordination are nevertheless given effect. A leading case in this Circuit is In re Aktiebolaget Kreuger & Toll, 96 F.2d 768, 770, from which the following is quoted: "Section 64b of the Bankruptcy Act, as amended, 11 U.S.C.A. § 104(b), for reasons of public policy, creates priorities regardless of the parties' contracts and overrides inconsistent covenants. But this does not mean that the parties are prohibited from making contracts for a priority or subordination in so far as they do not impinge upon statutory priorities. Section 65a of the act, 11 U.S.C.A. § 105 (a), means no more than that dividends paid to creditors shall be pro rata except where there is a priority given by law or by lawful contractual arrangement between the parties. Bird & Sons Sales Corporation v. Tobin, 8 Cir., 78 F.2d 371, 100 A.L.R. 654".

See, also, In re George P. Schinzel & Son, Inc., D.C., 16 F.2d 289, where Judge Learned Hand, as a Circuit Judge, also wrote on this question.

Counsel for some of the claimants argue that the COAB's contain only illusory promises. The holders thereof are entitled to be paid upon maturity, with two specified exceptions. (Finding 43.) Those two exceptions impose a subordination on these securities, which should be enforced against the holders thereof, unless we intend to give them something that they did not bargain for. The exception in the subordination provisions to the effect

that the COAB's, CC's, Old CO's, IB and NIB scrip are subordinate to the fixed interest debentures and the general indebtedness of Ageco, but shall not be subordinate to "indebtedness or Obligations convertible at the option of the Company into stock of the Company of any class or subordinated by their terms to other indebtedness or Obligations of the Company * * *", does not involve any inconsistency or confusion, even assuming that the latter class of obligations under their own terms would be entitled to an equal rating with the fixed interest debentures. Both requirements can be met. This is clearly shown in the following excerpt from the trustees' brief:

"1. First determine the dividends or participations that would be distributable to general creditors, debenture holders, CDC's, COAB's, IB and NIB Scrip if all were on an equal footing.

"2. Take the dividends or participations computed in this manner and distributable to the COAB's, IB and NIB Scrip and add them to the dividends or participations going to the debenture holders and other general creditors to whom the COAB's, the IB and NIB Scrip had agreed to subordinate their claims.

"The first step gives effect to the provisions of the contract that the COAB's, IB and NIB scrip are not subordinate to the CDC's. The second step gives effect to the provision of the contract that they are subordinate to other general creditors. Thus, all provisions of the contract are enforced without any inconsistency.

"This is exactly the order made by the Court and sustained on appeal in Bird & Son Sales Corporation v. Tobin [8 Cir.], 78 F.2d 371 [100 A.L.R. 654]."

Some question has arisen as to the meaning of conclusion of law No. 5. I believe that it does not cover an administrator, executor, or other legal successor by operation of law to all the rights and claims of the original holders. It seems to me that it does cover, however, any person who acquired COAB's by purchase or gift from an original holder, and also all holders of the IB and the NIB scrip. The scrip was issued as interest on the COAB's. To remove any doubt about the scope of conclusion of law No. 5, the IB and NIB scrip should be specifically included therein. The decree to be submitted confirming the Special Master's report should clarify conclusion of law No. 5 to the extent above indicated.

Submit proposed decree on five days notice to attorneys who appeared on this motion to confirm.

## Appendix A

(Referred to on page 108 of this opinion)

(a) Claims that the following securities heretofore issued by Associated Gas and Electric Company, Debtor, are valid and outstanding according to their terms or that the holders of such securities, by reason of their ownership of such securities, rank on a parity with General creditors of Associated Gas and Electric Company, Debtor, or are not bound by subordination provisions contained in any of said securities:

Convertible Debenture Certificates:

6½% Series B (Manila)
6½% Series C (Manila)
6 % Series B
6 % Series C
6 % Series D
6 % Series E
6 % Series A
6 % Series B of 1929
6 % 1931 Series
6 % Convertible Debenture Obligations, Series F
Convertible Debenture Certificates, Convertible Into Class A Stock, due November 1, 1999
Convertible Certificates, 5, 5½, 6, 6½ and 7% Series
Convertible Obligations without fixed maturity, 5, 5½, 6, 6½ and 7% Series
$8 Interest Bearing Allotment Certificates
$1.60 Interest Bearing Allotment Certificates

(b) Claims that the holders of the following securities heretofore issued by Associated Gas and Electric Company, Debtor, by reason of their ownership of such securities, rank on a parity with general creditors of Associated Gas and Electric Company, Debtor, or are not bound by the subordination provisions contained in said securities:

5 % Convertible Obligations, Series A, due 2002
5½% Convertible Obligations, Series A, due 2002
6 % Convertible Obligations, Series A, due 2002

6½% Convertible Obligations, Series A, due 2002

7 % Convertible Obligations, Series A, due 2002

6 % Convertible Obligations, Series B, due 2002

5 % Convertible Obligations, of 1932, due 2002

5½% Convertible Obligations of 1932, due 2002

6 % Convertible Obligations of 1932, due 2002

6½% Convertible Obligations of 1932, due 2002

7. % Convertible Obligations of 1932, due 2002

6 % Convertible Certificates of 1932, due 2002

(c) Claims that the holders of the following securities, heretofore issued by Associated Gas and Electric Company, Debttor, by reason of their ownership of such securities, rank on a parity with general creditors of Associated Gas and Electric Company, Debtor, or ahead of the securities listed in subdivision (b) of this paragraph or that they are not bound by the subordination provision contained in the following securities:

Interest Bearing Scrip Certificates (4%), due 1941 and 1942

Non-Interest Bearing Scrip Certificates, due 1941 and 1942

Consolidated Interest Bearing Scrip Certificates (4%), due June 15, 1944

Consolidated Non-Interest Bearing Scrip Certificates, due June 15, 1944

Consolidated Interest Bearing Scrip Certificates (4½%), due June 15, 1947.

Consolidated Non-Interest Bearing Scrip Certificates, due June 15, 1947.

## Appendix B

(Referred to on page 110 of this opinion)

1. The provisions in the CDC's, CC's, and Old CO's which gave Ageco an option to convert the securities into Preferred, Preference, or Class A Stock, were valid, legal, and binding on all holders of CDC's, CC's, and Old CO's.

2. By exercise of Ageco's option to convert, all CDC's, CC's and Old CO's (except such of the CDC's 1931 Series as are referred to in Conclusion of Law 7) were validly converted at the dates set for the conversions, namely, May 31, June 10, June 15, July 2, September 10, October 3 and November 16, 1932.

3. Those former holders of CDC's, CC's and Old CO's (except such of the CDC's 1931 Series as are referred to in Conclusion of Law 7) who surrendered their certificates and took COAB's became and should be classified as holders of COAB's and such transactions are valid and may not be set aside.

4. Those former holders of CDC's, CC's and Old CO's who still hold their CDC, CC or Old CO certificates, and those who took Preferred and Preference Stock (except present and former holders of CDC's 1931 Series referred to in Conclusion of Law 7) became and should be classified as Preferred and Preference stockholders, and such conversions are valid and may not be set aside.

7. Ageco did not validly convert such CDC's 1931 Series as to which six months had not elapsed by September 10, 1932 from the interest payment date next succeeding the date of original issue.

8. (a) Holders of the invalidly converted CDC's 1931 Series, referred to in Conclusion of Law 7, are unsubordinated general creditors of Ageco in the amount of the principal amount of their CDC's with interest thereon at the rate stipulated in the CDC's to January 10, 1940, less the face amount of checks and scrip received by said holders as interest on COB's.

(b) Original holders of COB's or $6 Cumulative Preference Stock obtained on an exchange for such invalidly converted CDC's 1931 Series, are unsubordinated general creditors of Ageco in the amount of the principal amount of the CDC's formerly held by them with interest thereon at the rate stipulated in the CDC's to January 10, 1940, less the face amount of checks and scrip received by said holders as interest on COB's.

## Appendix C

(Referred to on page 111 of this opinion)

13. The CC's and Old CO's contained provisions subordinating them, both as to principal and interest, to the senior obligations of Ageco. Such subordination provisions were substantially identical to those contained in the COAB's set forth in Finding of Fact 43.

22. The Convertible Obligations of 1932 due 2002, 5%, 5½%, 6%, 6½% and

7% Series, and the 6% Convertible Certificates of 1932 due 2002, were created by and issued pursuant to resolutions of the Board of Directors of Ageco adopted at a meeting held on April 19, 1932. By resolution of the Executive Committee of the Board of Directors of Ageco dated June 10, 1932, ratified by the Board of Directors of Ageco at a meeting held on June 21, 1932, the names of the Convertible Obligations of 1932, due 2002, were changed to 5%, 5½%, 6%, 6½%, and 7% Convertible Obligations Series A, due 2002 (hereinafter referred to as "COA's"), and the name of the 6% Convertible Certificates of 1932, due 2002, was changed to the 6% Convertible Obligations Series B, due 2002 (hereinafter referred to as "COB's"). The COA's and COB's are together hereinafter referred to as "COAB's".

36. Most of the holders of CDC's, CC's, and Old CO's accepted the optional exchange offer, surrendered the CDC, CC, or Old CO certificates and took COA's or COB's. Some took Preferred or Preference Stock, surrendering their CDC, CC, or Old CO certificates. Some holders of CDC's, CC's, and Old CO's did not surrender their certificates and still hold them.

43. The COAB's contained a subordination provision subordinating them both as to principal and interest to the senior obligations of Ageco, as follows:

"It is the intent hereof that this Obligation and all other Obligations of this issue shall be subordinate to the following (hereinafter called 'Senior Obligations'), namely: all bonds, debentures and other indebtedness of the Company and of any successor corporation, now or hereafter created and outstanding, except (1) the Obligations of this issue and (2) indebtedness or Obligations convertible at the option of the Company into stock of the Company of any class or subordinated by their terms to other indebtedness or obligations of the Company; and to that end it is hereby provided and agreed by each and every holder hereof as follows:

"(a) In the event that on any interest payment date the Company shall not have paid or provided for the payment of all interest due and payable on or before such interest payment date on all Senior Obligations, then and in such event any interest otherwise by the terms hereof payable on such date shall not then become payable, anything herein to the contrary notwithstanding, but shall cumulate (without interest) and shall become payable on the first interest payment date thereafter on which all interest due and payable on or before such date on all Senior Obligations shall have been paid or provided for.

"(b) The principal of this Obligation and all other Obligations of this issue shall be payable, at maturity, by declaration or otherwise, (i) only if and when the Company shall have paid or provided for the payment of all Senior Obligations that shall then be due and payable and (ii), if at the time such Obligations shall become payable the Company shall be bankrupt or insolvent or in liquidation, then only if and to the extent that there shall be assets of the Company remaining after all Senior Obligations (whether or not then due and payable) shall have been paid or provided for. If in any of the events specified in clause (ii) of this subdivision (b) the amount of such remaining assets shall be less than the aggregate principal amount of all of the Obligations of this issue then outstanding and of any other obligations of the Company of equal rank therewith then outstanding, then the registered owner of each Obligation of this issue then payable shall be entitled to receive only such proportion of the amount of such excess as the principal amount of such Obligations of this issue held by him shall bear to the total principal amount of all of the Obligations of this issue and of all other obligations of equal rank therewith then outstanding. Upon any payment of the principal of any of the Obligations of this issue, accrued and unpaid interest thereon to the date of such payment of principal shall also then be due and payable, but subject to the same conditions as are applicable to the payment of principal.

"Any obligations of the Company shall be deemed of equal rank with the Obligations of this issue if such obligations contain provisions substantially similar to the provisions of the foregoing paragraphs (a) and (b) for the purpose of subordinating such obligations to the Senior Obligations of the Company as hereinabove defined, and are not subordinated, as to payment of principal or interest, to the Obligations of this issue."

44. The COAB's had a fixed maturity date (February 15 or March 1, 2002). Interest was payable only if regular dividends had been paid on the stock into

which the COAB's were convertible during the quarterly interest period immediately preceding an interest payment date. The Directors had the power, however, to authorize interest payments even though dividends had not been paid on such stock. Interest, whenever paid, might be in such medium, either cash or securities, as the Board of Directors might determine. The COAB's were convertible into Preferred and Preference Stock at the Company's option. The holders also had an option to convert into Preferred Stock.

45. Many of the COAB's now outstanding were not issued in exchange for CDC's, CO's or Old CO's. Many COAB's were issued in the first instance for cash or on exchange for securities of other companies.

46. Many of the COAB's which were issued to those exercising the option given to holders of CDC's, CC's, and Old CO's, were sold or transferred by their original holders. All COAB's were issued in registered form and contained the following assignment form on the reverse side of each certificate:

"For value received the undersigned does hereby sell, assign and transfer unto ...... the within Convertible Obligation of Associated Gas and Electric Company, and does hereby constitute and appoint ...... attorney to transfer said Obligation on the books of Associated Gas and Electric Company, with full power of substitution in the premises.

"Dated ......

.................

"In the presence of:
.................."

47. The certificates for CDC's, CC's, Old CO's and COAB's contained the conditions on which the securities matured, a statement of the conversion options of the Company, the conditions on which the option terminated, and in the case of the CC's, Old CO's and COAB's a statement of the subordination provisions applicable to that security. In addition they contained a statement that by the acceptance of the certificate the holder assented to the terms therein contained.

*Interest and Non-Interest Bearing Scrip Due 1941, 1942, 1944 and 1947 (Hereinafter Called IB and NIB Scrip).*

48. After the May 15, 1933, and June 1, 1933, scrip payments referred to in Finding of Fact 41, no interest was paid on COAB's in any medium until October 5, 1936. Pursuant to resolutions of the Board of Directors, interest on the COAB's was resumed and brought up to date by the issuance on October 5, 1936, October 30, 1936 and November 30, 1936 of Interest Bearing (4%) and Non-Interest Bearing Scrip maturing in 1941. Thereafter such Scrip maturing in 1942, was issued quarterly to August 15, 1937 as interest on the 5%, 5½%, 6½% and 7% COA's and to September 1, 1937 as interest on the 6% COA's and COB's. The 1941 and 1942 scrip so issued was issued to all holders of COAB's including those who formerly held CDC's, CC's and Old CO's; none of this scrip was issued to holders of unsurrendered CDC's, CC's or Old CO's.

49. NIB Scrip was issued for fractions of $100 face amount. IB Scrip was issued in multiples of $100 face amount. Ageco permitted consolidation of NIB Scrip aggregating $100, or multiples thereof, in face amount into 1941 or 1942 IB Scrip if all the consolidated scrip bore the same expiration date. Ageco permitted consolidation of IB and NIB Scrip of more than one maturity date into IB and NIB Scrip, maturing in 1944 and 1947 (hereinafter referred to as "Consolidated Scrip").

50. All the IB and NIB Scrip contain subordination provisions substantially identical to those set forth in Finding of Fact 43.

51. The Scrip certificates maturing in 1941 and 1942 stated that they were issued "For Interest on Convertible Obligations of Associated Gas and Electric Company" and that "(Name of Holder) as the registered holder of Convertible Obligations" would be entitled at the maturity date to the face amount of the scrip (with interest thereon in the case of the IB Scrip) "representing interest * * * with respect to * * * Convertible Obligations". The Consolidated Scrip certificates maturing in 1944 and 1947 stated that the holder would be entitled on or after the maturity date to the principal amount of the certificate "said * * * holder * * * having exchanged for consolidation various scrip certificates for interest on convertible obligations of the Company".

52. Many IB and NIB Scrip certificates were sold or transferred by the

original holders. NIB and IB Scrip was issued in registered form only and contained the following assignment form on the reverse side of each certificate:

"For value received, the undersigned hereby assigns and transfers to ...... of ...... the within Scrip Certificate and all rights and interests evidenced thereby and hereby irrevocably constitutes and appoints ...... Attorney to transfer the same on the books of the within-named Company, with full power of substitution in the premises.

............(Seal)

"Dated ........
"In the presence of:
................"

53. Interest was paid in cash on the IB Scrip at the rate of 4% and 4½% on all interest dates preceding the filing of Ageco's petition in reorganization.

54. The certificates for the IB and NIB Scrip contained a statement of its subordination provisions and a provision that, by the acceptance of the certificate, the holder assented to all the conditions mentioned in it."