**In the Matter of EQUITY FUNDING CORPORATION OF AMERICA, a Delaware Corporation, Debtor.**

No. 73–03467.

United States District Court,
C. D. California.

Dec. 8, 1975.

O'Melveny & Myers by Everett B. Clary, A. Robert Pisano, Robert J. White, Los Angeles, Cal., for Robert M. Loeffler, as Trustee.

Grant G. Guthrie, Washington, D. C. and Richard Castro, Los Angeles, Cal., for S. E. C.

Shearman & Sterling by George J. Wade, Robert H. MacKinnon, New York City, for First National City Bank, as agent.

Whitman & Ranson by Dugald Campbell Brown, New York City, and Irell & Manella by Richard L. Bernacchi, Joan L. Lesser, Los Angeles, Cal., for U. S. Trust Co. of New York, successor indenture trustee for 5½% Convertible Subordinated Debentures due 1991.

McCutchen, Black, Verleger & Shea by G. Richard Doty, Roger A. Ferree, Los Angeles, Cal., for Chemical Bank, indenture trustee for 9½% Debentures.

Corinblit & Shapero by Jack Corinblit and Schwartz, Alschuler & Grossman by Marshall B. Grossman, Los Angeles, Cal., and Kirsch, Arak & Bulmash by Jay S. Bulmash, Beverly Hills, Cal., for Certain Class 8 Creditors.

Adams, Duque & Hazeltine by Perry Hirsch, Los Angeles, Cal., for Chase Manhattan Bank as Indenture Trustee for 5¼% Convertible Subordinated Debentures.

Jones, Day, Reavis & Pogue, Los Angeles, Cal. by Ellis McKay, Cleveland, Ohio, for BancOhio Corp.

Sulmeyer, Kupetz, Baumann & Rothman by Irving Sulmeyer, Los Angeles, Cal., and Burton M. Freeman, New York City, for Bankers Trust Co.

Hirschler & Fleischer by Everette G. Allen, Jr., Richmond, Va., Belcher, Henzie & Bieganzahn by Leo Bieganzahn, Los Angeles, Cal., for Fidelity Corp.

Baker, Hostetler & Patterson by Maurice M. Sayre, Cleveland, Ohio, for Certain Class 7 and 8 Creditors.

Diamond, Tilem, Colden & Emery by Herbert Colden, Los Angeles, Cal., for Certain Class 8 Creditors.

Feinerman, Furman & Klein by Stanley A. Furman, Beverly Hills, Cal., for Certain Class 8 Creditors.

David B. Gold, San Francisco, Cal., for Certain Class 5 Creditors.

Kadison, Pfaelzer, Woodard, Quinn & Rossi by Alan R. Woodard, Los Angeles, Cal., for Conservator of Equity Funding Life Ins. Co.

McDermott, Will & Emery by Wilber H. Boies, Chicago, Ill., for Certain Class 7 and 8 Creditors.

Abeles & Markowitz by Judith A. Gilbert, Beverly Hills, Cal., for Danning, Bankruptcy Trustee for Solomon Block.

Karns & Karabian by John H. Karns, Los Angeles, Cal., Bernstein, Golan & Yalowitz, Ltd. by Arthur J. Bernstein, Chicago, Ill., for 9½% Bondholders Protection Committee.

Bader & Bader by I. Walton Bader, New York City, for Independent Investor Protective League.

## MEMORANDUM AND ORDER APPROVING PLAN OF REORGANIZATION

PREGERSON, District Judge.

On April 5, 1973, this Court approved the petition of Equity Funding Corporation of America ("EFCA") for protection and reorganization under Chapter X of the Bankruptcy Act (11 U.S.C. § 501 *et seq.*).[1] On October 24, 1974, after soliciting suggestions for a plan pursuant to Section 167(6) of the Bankruptcy Act [11 U.S.C. § 567(6)], Robert M. Loeffler, the duly appointed and acting Trustee of EFCA, filed a proposed Plan for its reorganization.

Pursuant to Section 169 of the Bankruptcy Act (11 U.S.C. § 569), and after due notice to the Debtor, its creditors and stockholders, the Securities and Exchange Commission, the indenture trustees and the Secretary of the Treasury, as required by Section 171 of the Bankruptcy Act (11 U.S.C. § 571), hearings were held on that proposed Plan commencing December 9, 1974 and continuing from time to time until December 8, 1975. During that period the hearings consumed 28 court days. In the course of the hearings, the proposed Plan has undergone a number of amendments. The final amended Plan is dated December 5, 1975. In this Memorandum the term "Plan" refers to the December 5, 1975 amended version unless otherwise noted. An earlier version, identical in substance to the Plan, has been reviewed by the Securities and Exchange Commission, and its Advisory Report dated November 25, 1975 ("Advisory Report") has been received by the Court. The Advisory Report concludes that the Plan "may be found to be fair and equitable and feasible." The Court has considered that report, as well as all the evidence adduced at the hearings, the memoranda filed by the parties, the arguments of counsel, and the files and records in this entire proceeding. Accordingly, it is now appropriate for the Court to determine whether the Plan should be approved.

The Court finds that the Trustee's Plan complies with Section 216 of the Bankruptcy Act (11 U.S.C. § 616); that the Plan is "fair and equitable, and feasible" within the meaning of Section 174 of the Bankruptcy Act (11 U.S.C. § 574); and that the Plan should be approved. Therefore, pursuant to Section 174 of the Bankruptcy Act (11 U.S.C. § 574), the Court approves the Plan and orders that it be transmitted to the creditors of the estate for their acceptance or rejection, in accordance with the terms of the Orders herein dated December 8, 1975.

## I. BACKGROUND OF EFCA AND OF THE FRAUD

### A. *EFCA as of April 5, 1973*

EFCA is a Los Angeles-based holding company. Prior to the filing of the Chapter X petition, its subsidiaries were engaged in a diverse array of businesses. Major subsidiaries included four life insurance companies: Bankers National Life Insurance Company ("Bankers"), chartered in New Jersey and headquartered in Parsippany, New Jersey; Northern Life Insurance Company ("Northern"), chartered in Washington and headquartered in Seattle, Washington; Equity Funding Life Insurance Company ("EFLIC"), chartered in Illinois and headquartered in Los Angeles, California; and Equity Funding Life Insurance Company of New York ("EFNY"), a wholly-owned subsidiary of Bankers chartered and doing business in the state of New York.

EFCA's subsidiaries also included an investment advisory company that managed

---

1. On August 1, 1975, procedural rules governing Chapter X proceedings under the Bankruptcy Act became effective. Order Approving Chapter X Rules and Official Forms, 421 U.S. 1021 (1975). These rules apply to pending proceedings unless the Court finds that their application would not be feasible or would work an injustice. 421 U.S. at 1022. Unless otherwise noted, any reference in this Memorandum to a specific section of the Bankruptcy Act is to that section as modified, if at all, by the Chapter X rules.

three mutual funds; a securities and broker-dealer group which licensed EFCA salesmen to sell securities and which had seats on a number of regional stock exchanges; a savings and loan association with three offices in Los Angeles; a foreign financing group organized to obtain Eurodollar and foreign currency borrowings, the leading subsidiary of which was Equity Funding Capital Corporation, N. V. ("NV"), which in turn owned an international merchant bank located in Nassau, Bahamas; and companies engaged in cattle breeding, real estate development, and oil and gas exploration. Other subsidiaries operated a marketing organization consisting of approximately 130 branch offices throughout the United States, staffed by more than 5,000 licensed salesmen. The salesmen marketed a broad range of financial products and services sponsored by both EFCA and other companies, including the Equity Funding Program, described below; life insurance policies; various mutual fund shares; and limited partnership interests in oil and gas, cattle, and real estate ventures.

The Equity Funding Program had been EFCA's most vigorously marketed product. The company initiated the sale of these programs in 1960, the year it was formed. A participant in the program would undertake: (1) to purchase a life insurance policy and (2) to invest in mutual fund shares over a ten-year period. The program worked in this fashion: The participant would annually purchase and pay for a number of mutual fund shares. EFCA would pay the annual premium on the participant's life insurance policy as it came due, recording each payment as a loan to the participant, and retaining the participant's mutual fund shares as collateral for the loan. Each year, the participant reborrowed the outstanding indebtedness and accrued interest, plus the annual premium on his insurance policy, and a promissory note to EFCA for the amount borrowed was executed. Each year the participant had to purchase sufficient mutual fund shares to satisfy the collateral requirements for his note. These programs were sold with the expectation that the mutual fund shares which the participant

purchased would increase in value during the life of the program in an amount equal to or greater than the total cost of the life insurance premiums and the accrued interest.

EFCA received commissions from the sale of both the mutual fund shares and the insurance policies it sold to the program participants, and it also received interest on the money it loaned to those participants to pay their insurance premiums. Moreover, sales of Equity Funding Programs could generate income for EFCA from two other sources. If the insurance policy sold was issued by a subsidiary of EFCA, that subsidiary could expect to earn a profit during the time the policy was kept in force. And, if the mutual fund shares were issued by a fund managed by an EFCA subsidiary, the management fees paid by the fund to that subsidiary increased.

By early 1973, EFCA and its subsidiaries maintained more than 200,000 public customer accounts. These public customers included Equity Funding Program participants, life insurance policyholders, participants in programs to purchase mutual funds, and limited partners of EFCA-sponsored partnerships. Not a single public customer has been damaged by these Chapter X proceedings or by the events that gave rise to them, with the exception of some of the participants in funding programs sold before 1963; these customers are provided for in the Plan.

When the Chapter X petition was filed, EFCA had outstanding 7,835,127 shares of common stock. The stock was listed on the New York Stock Exchange and in 1969 had traded as high as 92½. At the close of business on March 16, 1973, immediately before rumors of the EFCA fraud began to affect the market, the stock traded at 25⅜. By March 27, 1973, when trading was suspended, the stock had declined to 14⅜. The stockholders' interest in EFCA, as such, was without value due to its insolvency. But under the Plan, the EFCA stockholders will realize substantial recoveries as "fraud claimants" (*see* Part V D *infra*).

EFCA's total scheduled debt as of April 5, 1973, exclusive of trade creditors, was $204,564,609, as follows:

| Debt Holder | | Date | Amount |
|---|---|---|---|
| **SECURED** | | | |
| Revolving Credit Agreement (before set offs)[2] . . . . . . . . . . . . . . | | 06–29–72 | $ 50,535,688 |
| First National City Bank . . . . . . . . . . . . . . | 23,583,321 | | |
| Wells Fargo Bank . . . . . . . . . . . . . . . . . . . . | 10,107,137 | | |
| Franklin National Bank . . . . . . . . . . . . . . . | 10,107,138 | | |
| National Bank of North America . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,738,092 | | |
| Wells Fargo Bank . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 06–29–72 | 309,375 |
| Various individuals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 07–14–72 | 158,967 |
| Israel Discount Bank & Bankers Trust Co.[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 01–28–71 | 5,105,000 |
| | | | $ 56,109,030 |
| | | | |
| **CUSTODIAL COLLATERAL NOTES**[4] | | | |
| Pennsylvania Life . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | Various | $ 5,814,753 |
| State Farm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | Various | 2,250,000 |
| Cosmos Bank[5] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 06–22–71 | 1,200,000[6] |
| National Bank of North America . . . . . . . . . . . . . . . . . . | | 03–27–72 | 5,000,000 |
| National Newark & Essex Bank . . . . . . . . . . . . . . . . . . | | 05–01–72 | 5,000,000 |
| First National City Bank . . . . . . . . . . . . . . . . . . . . . . . . | | 06–01–72 | 5,000,000 |
| Wells Fargo Bank . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 06–15–72 | 5,000,000 |
| American National Bank & Trust Co. . . . . . . . . . . . . . . | | 07–10–72 | 5,000,000 |
| United California Bank . . . . . . . . . . . . . . . . . . . . . . . . . | | 09–15–72 | 5,000,000 |
| Seattle First National Bank . . . . . . . . . . . . . . . . . . . . . | | 11–01–72 | 1,000,000 |
| | | | 40,264,753 |
| | | | |
| **UNSECURED** | | | |
| 9½% Debentures[7] . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 12–01–70 | 22,000,000 |
| Dow Banking Corporation[5,8] . . . . . . . . . . . . . . . . . . . . . | | 12–23–71 | 6,192,000[6] |
| Dow Banking Corporation[5] . . . . . . . . . . . . . . . . . . . . . . | | 02–17–72 | 5,944,000[6] |
| BancOhio Corporation . . . . . . . . . . . . . . . . . . . . . . . . . | | 06–29–72 | 8,000,000 |
| Nash Agency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 12–01–72 | 183,440 |
| Realty Insurance Associates . . . . . . . . . . . . . . . . . . . . . | | 12–06–72 | 190,386 |
| Cosmos Bank[5] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 06–22–71 | 39,000[6] |
| | | | 42,548,826 |
| | | | |
| **SUBORDINATED** | | | |
| 5¼% Debentures[5,7] . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 02–01–69 | 23,872,000 |
| 7½% Subordinated Notes[5] . . . . . . . . . . . . . . . . . . . . . | | 11–15–69 | 3,270,000 |
| 5½% Debentures[7] . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 12–01–71 | 38,500,000 |
| | | | 65,642,000 |
| **TOTAL** . . . . . . . . . . . . . . . . . . . . . . . . . . | | | $204,564,609 |

---

While EFCA's published financial statements reported substantial stockholders' equity, the assets reported in those statements were grossly inflated. The investigation conducted by the Trustee revealed that as of April 5, 1973, EFCA's real assets totaled but $158,656,510 on an unconsolidated basis. Thus, EFCA was hopelessly insolvent based upon scheduled debt alone. In addition, EFCA was subject to contingent claims

2. Secured by 100% of the stock of Bankers and Northern and 60% of the stock of EFLIC. The validity of the security interest in Bankers and Northern is disputed.

3. Secured by 40% of the stock of EFLIC, which is being liquidated (*see* note 9 *infra*).

4. These notes represent funds EFCA borrowed to finance Equity Funding Programs. They are secured by notes from Equity Funding Program participants, which in turn are secured by the participants' mutual fund shares. The adequacy of the security is disputed in relatively minor respects, and the dispute has been settled by an agreement approved by the Court.

5. Issued by NV and guaranteed by EFCA.

6. Three loans to NV are payable in Swiss Francs. The amounts shown are based on an exchange rate in effect on April 5, 1973.

7. Publicly issued debentures.

8. Certain assets of EFCA were pledged to secure the guarantee. A dispute over the validity of the pledge has been compromised under an agreement approved by the Court.

based on fraud and on violations of the Securities Act of 1933 (15 U.S.C. § 77a *et seq.*) and the Securities Exchange Act of 1934 (15 U.S.C. § 78a *et seq.*) ("Securities Acts").

## B. *The Equity Funding Fraud*

A trustee under Chapter X is mandated by Sections 167(1) and (3) of the Bankruptcy Act [11 U.S.C. §§ 567(1) and (3)] to file two reports, one relating to the property, financial condition, and operation of the business of the debtor, and other matters bearing upon the possibility of reorganization; and the second relating to fraud, misconduct, mismanagement, and causes of action available to the estate. These reports were filed by the Trustee on February 22 and October 31, 1974. The nature and extent of the fraud revealed by those reports is important to an understanding of the legal and factual problems dealt with in the Plan.

In essence, the Trustee concluded that EFCA had falsified financial records beginning at least as early as 1964 and continuing until the date the petition was filed. The falsification primarily consisted of inflating or creating assets and income, failing to record liabilities, and creating bogus insurance policies, which were then coinsured. The Trustee reported that, contrary to its publicly issued financial reports, EFCA was probably never profitable. During the period 1964 through 1972, at least $143 million in fictitious pre-tax income and fictitious assets in a corresponding amount were recorded in the Company's financial statements. Approximately $85 million of this total represented inflated receivables attributed to the Equity Funding Program. Following the completion of an audit by Touche Ross & Co., the Court-appointed auditors, more than $143 million of fictitious or fraudulently inflated assets were eliminated from EFCA's books, and more than $42 million of assets were written

down to reflect more realistic values. As a result, on EFCA's balance sheet, unconsolidated assets were written down from $344.2 million to $158.6 million, and stockholders' equity went from $143.4 million to a deficit of $42.1 million.

These facts have given rise to the filing of more than 100 federal court actions against EFCA, its subsidiaries and others, by or on behalf of present and former holders of EFCA debt and equity securities, in which the plaintiffs claim damages for fraud and violation of the Securities Acts. These actions have been coordinated and consolidated in the Central District of California by the Judicial Panel on Multi-District Litigation [*In re Equity Funding Corporation of America Securities Litigation,* M.D.L. Docket No. 142 (C.D.Cal.)] ("Multi-District Actions"), but are stayed by this Court so far as EFCA and its subsidiaries are concerned. *See In re Equity Funding Corp. of America,* 396 F.Supp. 1266 (C.D. Cal.1975). Similar fraud and Securities Acts violations have been asserted in these Chapter X proceedings on behalf of the same holders of EFCA debt and equity securities.

## II. THE REORGANIZED COMPANY

When EFCA's true financial condition was uncovered, it became apparent that the principal income-producing assets were Bankers and Northern, and that EFCA would have to be reorganized around them if it were to be reorganized at all. Accordingly, the Trustee, with the approval of the Court, sold or liquidated subsidiaries that were insolvent, were losing operations, required infusions of unavailable cash, or could not provide support for the contemplated insurance operation. EFLIC, which was insolvent, was taken over by the Insurance Department of the State of Illinois, and placed in liquidation. Those liquidation proceedings, which are now nearly concluded,[9] provide for the complete protection of

---

**9.** A Plan of Liquidation has been approved by the Circuit Court of Du Page County, Illinois. *In re People ex rel. Robert B. Wilcox v. Equity Funding Life Insurance Co.,* Case No. 73 1019 G, and the order of approval has been affirmed by the Supreme Court of the State of Illinois. *People ex rel. Robert B. Wilcox v. Equity Life Insurance Company,* 61 Ill.2d 303, 335 N.E.2d

EFLIC policyholders through the assumption of all existing policies by Northern.

Sales of the Equity Funding Program were suspended upon disclosure of the EFCA fraud, because that disclosure rendered ineffective the Prospectus under which the program had been sold. No attempt has been or will be made to resume sales of these programs. Their sales appeal has been substantially impaired by rising interest rates and uncertain stock market conditions. In addition, the Trustee's investigation into EFCA's business affairs disclosed that the cost of administering the programs exceeded the revenues derived from them. The marketing organization, which handled products and services including the Equity Funding Program, has been reorganized by eliminating unproductive branches and by converting the productive branch offices into general agencies of Bankers and Northern.

Moreover, existing Equity Funding Programs are being liquidated. In the liquidation process, the rights of individual program participants are protected. A participant may either pay the amount due on his note and receive delivery of his mutual fund shares, or his mutual fund shares, which secure his note, will be sold. In the latter case, the secured note will be paid from the proceeds of sale and any remaining equity will be delivered to the participant.

As a result of these sales and liquidations, the businesses that now remain are Bankers and Northern, a portion of the securities and broker-dealer group which licenses life insurance agents of Bankers and Northern to sell securities, the cattle group which will be sold as soon as favorable market conditions permit, and other minor operations that are in process of sale or liquidation. Under the Plan, these assets will be placed in a holding company, which may be a newly-formed corporation or a recapitalized EFCA (for convenience, this Memorandum will hereafter refer to the new entity as the "New Company"). Whether New Company is a new corporation or a recapitalization of EFCA will not change the substance of the Plan. The Plan also provides for initial working capital for New Company of at least $2 million.

The use of a holding company to control the operating insurance subsidiaries will add flexibility to New Company. Restrictions applicable to the operation of life insurance subsidiaries will not apply to the holding company. The holding company structure will not significantly increase operating costs. Other than debt service, New Company's expenses will consist only of salaries for its chief executive officer and a small staff, all of whom may also serve as employees of either Bankers or Northern, or both; rent for a small headquarters office; and fees for limited accounting services. The Plan does not affect the operating businesses of Bankers and Northern, nor does it affect the ability of Bankers and Northern to protect their policyholders.

The Plan can be substantially consummated and New Company can commerce business before the Trustee has completed certain administrative details which are unrelated to the launching of New Company, including prosecution of pending litigation on behalf of the estate. Thus, when New Company starts business, the Plan envisions the Trustee's retention of sufficient cash to finance his administration to its conclusion. Thereafter, any cash on hand beyond the needs of the estate will be turned over to New Company as a capital contribution.

The reorganized company, whatever its configuration, could not carry EFCA's debt burden. As previously noted, total scheduled debt as of April 5, 1973 was more than $200 million. That amount has since been

---

448 (1975). In addition, this Court approved an agreement between the Trustee and the Conservator of EFLIC governing the Trustee's participation in the liquidation proceedings. That ruling was affirmed by the Court of Appeals in *Equity Funding Corp. of America v. Loeffler*, 519 F.2d 1274 (9th Cir. 1975). The time to petition to the Supreme Court of the United States for a writ of certiorari to review the Ninth Circuit affirmance has expired; with respect to the decision of the Illinois Supreme Court, that time expires on December 26, 1975.

reduced to approximately $160 million (exclusive of post-petition interest and fees) primarily in two ways:

(a) Creditors of NV, whose debts EFCA had guaranteed, were partially paid from the liquidation of NV and from certain EFCA assets in which some of NV's creditors claimed a security interest, a claim that has been compromised with the approval of the Court.

(b) The claims of the lenders that had financed the Equity Funding Program have been compromised, pursuant to an agreement approved by the Court. Under the compromise, the money received from payment of the participants' notes (see p. 8 *supra*) will be paid to the lenders and to the debtor estate on agreed-upon terms, and, as a consequence, the debtor estate will receive approximately $5.4 million. The lenders will retain a general unsecured claim against the estate for certain pre-petition interest charges in the approximate amount of $550,000, and the custodian bank that held the security will retain a general unsecured claim of $1 million.

Under the Plan, all the remaining debt will be discharged by issuance of one class of voting common stock of New Company, except for (1) certain priority and other claims, all in relatively minor amounts, which will be paid in cash and (2) the debt incurred under the Revolving Credit Agreement.

As of April 3, 1973, the debt owed to the group of banks led by First National City Bank under the Revolving Credit Agreement totaled $50,535,688.19. As previously stated, the loan was secured by a pledge of all the stock of Bankers and Northern (subject to certain disputes to be discussed later) and 60% of the stock of EFLIC. On April 3, 1973, these banks declared the loan in default, and offset EFCA's bank deposits of $7,953,719.14, leaving a balance of $42,-581,969.05. Interest and fees under the Revolving Credit Agreement from April 5, 1973 to March 31, 1976 total approximately $15,600,000, and would be recoverable from the security, if the loan were fully secured.

Under the Plan these items are to be discharged in the following manner: The lending banks will be permitted to retain the sum of $7,953,719.14, which they offset on April 3, 1973. They will waive all interest and fees that have accrued under the Revolving Credit Agreement since April 5, 1973. They will be paid the sum of $15 million in cash or in New Company's Senior Secured Notes. It is anticipated that this $15 million payment will be made $7 million in cash and $8 million in Senior Secured Notes, assuming the cattle group is not sold by the time New Company ·is launched. Proceeds from the sale of the cattle group, when sold, will be applied against the Senior Secured Notes. It is estimated that the cattle group can be sold for approximately $5 million within two years. In addition to this $15 million payment, the lending banks will be issued another series of New Company's notes called Senior Secured Income Notes in the amount of $27,581,969.05.

Five million dollars of the Senior Secured Notes mature eight years from date of issuance, and the balance mature in five years. The notes bear interest at 2% above First National City Bank's prime rate, except that, upon the sale of certain assets, up to $1,280,000 of these notes bear interest at ¼% above that bank's prime rate but in no case more than 7%. These notes have been valued at their face amount, because, in general, the borrowing terms are standard.

The Senior Secured Income Notes are 12-year notes, amortizable in the third through twelfth years as to principal. They contain provision for deferral of payments of principal, if earnings of New Company fail to reach prescribed levels. They bear interest at ¼% above First National City Bank's prime rate, but in no case more than 7%. Payment of interest for the first two years may be deferred and amortized over the succeeding five years without any penalty or additional charge. Because of these terms, the fair market value of these notes is $19,847,000 compared to their face amount of $27,581,969.05.

As previously noted, under the Plan all other claims, with minor exceptions, will be

discharged by issuance of voting stock in New Company. Subject to Court approval, the initial directors and officers of New Company will be appointed by the Trustee. Thereafter, the directors will be elected by the stockholders and the directors, in turn, will elect officers in the usual manner. To this end, the Plan requires the convening of a stockholders' meeting within six months after the end of New Company's first fiscal year, which is now expected to be December 31, 1976.

The Plan provides for discharge of all claims not recognized in the Plan and for court orders permanently enjoining and dismissing all actions against EFCA's subsidiaries based on EFCA's fraud.

## III. THE PLAN IS FEASIBLE

■ Section 174 of the Bankruptcy Act (11 U.S.C. § 574) requires, among other things, that a plan of reorganization be feasible. This means that the Plan must propose a business entity that has assets capable of producing sufficient income to assure its long-term viability and to service its debt. 6A W. Collier, Bankruptcy, ¶ 11.-07, at 637–44 (14th ed. 1972).

■ A finding of feasibility requires the Court to consider, among other things, a projection of the income of the reorganized company. In this case, New Company's principal income-producing assets—Bankers and Northern—present sui generis problems of projecting earnings. The method normally used to project earnings of a business organization focuses on the following elements: (1) past earnings reports and (2) future sales and expense assumptions. *Protective Committee v. Anderson,* 390 U.S. 414, 441–53, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); *Consolidated Rock Products Co. v. Du Bois,* 312 U.S. 510, 526, 61 S.Ct. 675, 85 L.Ed. 982 (1941). This method of projecting earnings should be used unless special factors make it an unreliable guide to future earning expectancy (*Protective Committee v. Anderson, supra,* 390 U.S. at 452, 88 S.Ct. 1157). Such special factors exist in this case.

■ As life insurance companies, Bankers and Northern historically reported their earnings on the basis of statutory accounting, a method of accounting prescribed by state insurance departments. While sufficient for regulatory purposes, such as measuring the solvency of a life insurance company to insure protection of policyholders, past earnings reported under this method of accounting may not be the most reliable guide to future earnings and can be misleading to public investors for two reasons. First, a life insurance company expends a substantial sum to sell a policy and to place it on the company's books. Statutory accounting requires the company to charge this one-time payment as an expense in the first year of the policy, rather than spreading it over the life of the policy. Second, statutory accounting requires the build-up of reserves for new policies at a rate that is higher than experience generally proves necessary. For these two reasons, a company that is writing large amounts of new life insurance business may show low earnings, or even losses, although the new business will produce large income over the life of the new policies written. By comparison, a company that is writing no new business may show large profits from policies written in earlier years, even though such a company is, in effect, going out of business. Past statutory earnings of Bankers and Northern are particularly unreliable indicators of future earning expectancy because both companies have substantially increased their new business production and have made significant changes in the nature of their operations and types of insurance sold during the administration of the estate.

Recognizing the need for a more accurate determination of annual earning capability, the American Institute of Certified Public Accountants has developed an Audit Guide for the preparation of financial statements of stock life insurance companies based upon generally accepted accounting principles ("GAAP"). This guide is to be used for all financial statements issued to public investors after January 1, 1974. Under GAAP, expenses are allocated more evenly over the life of the policies a company

writes, and policy reserves are established on realistic bases. Thus, GAAP earnings reports do not have the characteristics of statutory reports mentioned above. Although some stock life insurance companies have reported or restated prior earnings on GAAP, Northern had no audited financial statements prepared on GAAP, and the existing Bankers GAAP financial statements were prepared on the basis of a prior tentative draft of the Audit Guide. Thus, neither company had past earnings data which could be used for making realistic future income projections.

For the reasons stated above, a more reliable way to predict future earnings of a life insurance company is to analyze the following elements: its in-force business, its forecasted future sales of new policies, and its income from assets not attributed to policy reserves. This was done for both Northern [10] and Bankers. The Court heard expert testimony for this purpose, and, by methods used and generally accepted in the life insurance industry, 10 year projections of future earnings were made, both on statutory and GAAP bases. Since earnings of life insurance companies cannot be consolidated with those of a parent or affiliated company for tax purposes,[11] these earnings projections were adjusted for taxes.

■ A life insurance company is permitted by law to pay ordinary dividends only on the basis of its statutory income. Thus, the projected statutory income of Bankers and Northern is critical to a determination of feasibility, because dividend income from Bankers and Northern will be the principal source of funds to New Company for the payment of the Senior Secured Income Notes and, perhaps, for payment of a part of the Senior Secured Notes. Modest amounts of additional income may be realized from the securities group and from

interest earned from funds on hand. Appendix I shows the projected cash flow of New Company from these sources and all items of expense, including debt service. As Appendix I demonstrates, cash flow will be adequate to service debt.[12]

So long as cash flow is adequate to cover required debt service, the more significant projection from the investor's point of view is that of GAAP earnings. Appendix II shows the projected consolidated earnings of New Company on that basis.

It should be observed that, under the Senior Secured Income Note Agreement, New Company's obligation to amortize the Income Notes generally is limited to 50% of the combined statutory earnings of Bankers and Northern for the prior year. Moreover, the cash flow analysis in Appendix I demonstrates that 50% of the statutory earnings is sufficient for servicing not only the Senior Secured Income Notes, but the Senior Secured Notes as well. Thus, fully one-half of the earnings of the insurance companies is available for reinvestment, for meeting unexpected financial problems, or for paying dividends to the stockholders of New Company.

On the basis of these data, the Court finds that the Plan is feasible.

## IV. VALUATION

■ It is necessary to value assets to be transferred to New Company for three purposes. See 6A W. Collier, supra ¶ 11.05, at 588. First, the lending banks under the Revolving Credit Agreement claim as security the stock of Bankers and Northern; therefore, the value of this security must be determined. Second, the plan makes no provision for stockholders as such; therefore, it can be approved only if EFCA is

---

10. The future earnings of Northern's in-force business included the projected earnings from valid life insurance policies of EFLIC which are to be assumed by Northern pursuant to the EFLIC Plan of Liquidation. This was done on the assumption that the EFLIC Plan of Liquidation will be finally approved before the consummation of this Plan. See note 9 supra.

11. A life insurance company must file its own tax return. The parent, in turn, pays no taxes on the earnings of or dividends received from the subsidiary insurance company.

12. Appendix I does not include the projected results of operations of the cattle group. It is expected that the group will carry itself until sold.

insolvent, *i. e.*, the claims of creditors exceed the value of its assets. Third, the creditors who are paid in New Company stock need to evaluate the economic effect of the Plan; therefore the value of New Company must be determined.

■ For all three purposes, the Court is required to determine the "reorganization value" of New Company. *Consolidated Rock Products Co. v. Du Bois, supra*. The reorganization value of an ongoing business is the present value of the future earning capacity of the business. *Protective Committee v. Anderson, supra* 390 U.S. at 441–42, 88 S.Ct. 1157; *Consolidated Rock Products Co. v. Du Bois, supra* 312 U.S. at 526, 61 S.Ct. 675. Future earnings are normally based on past earnings reports. However, for the reasons stated in Part III, the feasibility section of this Memorandum, the future earnings of Northern and Bankers were developed from the heretofore mentioned analysis of their in-force business, their future sales capability, and their income from assets not attributed to policy reserves.

■ Each segment of future earnings was then discounted or capitalized to arrive at the present value of the future earning capacities of Bankers and Northern, as follows:

(a) The value of each company's existing business was determined by projecting profit flow from that business for 30 years and then discounting to present value at 15%.

(b) The value of each company's future sales capability was determined by capitalizing at five times the present value of the future profits from one year's production of business.

(c) The value of the assets not attributed to policy reserves was determined by adjusting these assets to their market value. These assets are stocks, bonds, mortgages and/or other investments that have a readily determinable market value. That market value is the appropriate measure of their value for reorganization purposes, since the value determined by investors in the marketplace is the best indicator of the present value of the future earnings of the assets. *See Central States Electric Corp. v. Austrian,* 183 F.2d 879, 884–85 (4th Cir. 1950), *cert. denied,* 340 U.S. 917, 71 S.Ct. 350, 95 L.Ed. 662 (1951); *In re Warren Bros. Co.,* 39 F.Supp. 381, 385 (D.Mass.1941). The Court finds that this method of determining the present value of future earning capacity adequately recognizes relevant risks and market factors and is fair and reasonable.

These values were determined as of December 31, 1973. The projected after-tax GAAP earnings from January 1, 1974, to March 31, 1976, were then added to these values to determine reorganization value as of March 31, 1976. That value, as so determined, is $54,315,000 for Northern and $51,121,000 for Bankers. The value of Northern includes the value of the in-force policies of EFLIC, which are to be assumed by Northern pursuant to the EFLIC Plan of Liquidation.[13]

■ The two other business activities to be transferred to New Company—the cattle group and the securities and broker-dealer group—were valued by estimating the market value of their constituent assets, because neither has an earning history and because the cattle group is to be sold. *See* 6A W. Collier, *supra,* ¶ 11.05, at 604. The value of the securities and broker-dealer group is simply the value of its marketable securities and cash, totaling $1,575,000. The cattle group has two principal assets—cattle and land—from which, based on appraisals of the land and cattle after adjustment for other factors, it is projected that $5,500,000 net will be realized upon ultimate disposition. Miscellaneous noncontingent assets of $671,000 and $2 million cash for start-up working capital will also be transferred to New Company. Thus, the total reorganization value of New Company's assets at the projected transfer date of March 31, 1976 will be $115,182,000.

---

**13.** *See* notes 9 and 10 *supra.*

As noted above, New Company will start business with debt consisting of Senior Secured Notes in the face amount of approximately $8 million and Senior Secured Income Notes in the face amount of $27,581,-969.05, but having a present value of $19,-847,000. Thus, the reorganization value of the common stock of New Company will be $87,275,000. Based on the number of shares estimated to be issued under the Plan, the reorganization value per share would be $11.02.[14] A recapitulation of the reorganization value of the assets and securities of New Company is set forth in Appendix III to this Memorandum.

■ Reorganization value represents the best estimate of value the marketplace would put on a company comparable to New Company. However, because of uncertainties associated with a company emerging from Chapter X proceedings, possible initial selling pressure, and perhaps other factors, individual shares of stock of New Company may trade in the near future at less than reorganization value.

## V. THE PLAN IS FAIR AND EQUITABLE

■ Section 174 of the Bankruptcy Act (11 U.S.C. § 574) also requires that a plan of reorganization be fair and equitable. This means that the distributions to creditors provided for in the Plan must satisfy the "absolute priority rule." This rule requires that creditors be grouped into classes which are then ranked in order of priority, and that no class receive anything of value until senior classes have received full compensation for the value of their claims. *Protective Committee v. Anderson,* 390 U.S. 414, 441, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); *Marine Harbor Properties, Inc. v. Manufacturers Trust Co.,* 317 U.S. 78, 85, 63 S.Ct. 93, 87 L.Ed. 64 (1942); *Consolidated Rock Products Co. v. Du Bois,* 312 U.S. 510, 527, 61 S.Ct. 675, 85 L.Ed. 982 (1941); *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 115–19, 60 S.Ct. 1, 84 L.Ed. 110 (1939); *see generally* 6A W. Collier, *supra* ¶ 11.06. Thus, for example, creditors who hold a security interest in assets of the debtor should rank ahead of all other creditors with respect to those assets. Following secured creditors, the general unsecured creditors are entitled to payment in full before anything may be allocated to other creditors whose claims may be subordinated by express agreement or otherwise. Finally, after all creditors are paid, and only then, may provision be made for stockholders. Thus, where, as here, the debtor is insolvent, stockholders receive nothing as stockholders.

■ While these principles are simple in the abstract, their application in this case is difficult and complex. This is so because there are disputed issues of fact and law with respect to the relative ranking of various classes of EFCA's creditors. Where disputes exist the court has the power to approve a plan of reorganization which compromises the disputes by making provision for each such class in an amount that falls within the reasonable range of litigation possibilities. *Protective Committee v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 115–19, 60 S.Ct. 1, 84 L.Ed. 110 (1939); *In re Associated Gas & Electric Co.,* 61 F.Supp. 11 (S.D. N.Y.1944), *aff'd* 149 F.2d 996 (2d Cir.), *cert. denied,* 326 U.S. 736, 66 S.Ct. 45, 90 L.Ed. 439 (1945); *In re Midland United Co.,* 58 F.Supp. 667 (D.Del.1944). The test the court should apply in determining whether to approve a compromise plan is the same as that applied to any form of compromise presented to a court of bankruptcy, namely, is the compromise fair and equitable?

*Protective Committee v. Anderson, supra,* sets forth guidelines for determining

---

**14.** The Advisory Report correctly notes at page 16 that, since $500,000 will be reserved for distribution in lieu of small distributions of shares, the more accurate computation produces a number of $11.083. However, as that report also points out at page 45, these numbers are necessarily approximations and their significance is in their order of magnitude rather than their exact amount. For this reason, this Memorandum will use the data introduced into evidence, which produce the $11.02 figure.

whether a proposed compromise is fair and equitable:

"In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts. . . it is essential that every important determination in reorganization proceedings receive the 'informed, independent judgment' of the bankruptcy court. . . . The requirements of §§ 174 and 221(2) of Chapter X, . . . that plans of reorganization be both 'fair and equitable', apply to compromises just as to other aspects of reorganizations. . . . The fact that courts do not ordinarily scrutinize the merits of compromises involved in suits between individual litigants cannot affect the duty of a bankruptcy court to determine that a proposed compromise forming part of a reorganization plan is fair and equitable. . . . There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation." 390 U.S. at 424–25, 88 S.Ct. at 1163. (citations omitted).

While the court must apprise itself of the probabilities of ultimate success should disputed issues be litigated, it is not the duty of the court to determine those issues, for that would render compromise useless. This sensible view is explicated in *Florida Trailer & Equipment Co. v. Deal*, 284 F.2d 567 (5th Cir. 1960):

"Of course, the approval of a proposed settlement does not depend on establishing as a matter of legal certainty that the subject claim or counterclaim is or is not worthless or valuable. The probable outcome in the event of litigation, the relative advantages and disadvantages are, of course, relevant factors for valuation. But the very uncertainties of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the Congressional infusion of a power to compromise. This is a recognition of the policy of the law generally to encourage settlements. This could hardly be achieved if the test on hearing for approval meant establishing success or failure to a certainty." 284 F.2d at 571.

In these proceedings, the Court has been fully informed on the disputed issues of fact and law and on the evidence and authorities bearing thereon. Wherever appropriate, the Trustee has made a thorough investigation of the facts applicable to these disputed issues and has made the results of that investigation available to all counsel as well as to the Court. The investigation included numerous informal interviews and depositions. The Trustee and counsel for interested parties have filed detailed memoranda setting out the pertinent facts and the evidence bearing on any disputed factual issue. Numerous memoranda have also been filed with the Court by both the Trustee and interested parties, bearing on the disputed issues of law. Short of conducting a full trial on the merits, little more could have been done to inform the Court of these disputed issues and of the evidence, facts, and law bearing on their resolution.

Compromise of these disputes is desirable because litigation creates a substantial risk of depleting the assets of the debtor estate. Trial of these complex factual disputes would consume many weeks or months of court time and, because the legal issues are novel, would inevitably lead to appeals to the Ninth Circuit and probably to the Supreme Court. Thus, the delay in litigating these issues would be immense. The principal assets of the debtor estate consist of

Bankers and Northern, both going businesses that rely on skilled and qualified personnel within the organization and on agents throughout the country who sell their life insurance policies. These companies have retained most of their personnel and their agents despite these proceedings due to the prospect of reorganization at an early date. Should that prospect be clouded by protracted litigation, these relationships could be impaired or lost, to the irreparable detriment of the debtor estate.

Moreover, the Court has heard testimony and reviewed extensive memoranda suggesting how particular resolutions of each of the issues would affect the distribution that would be made to the various classes of creditors. As a result, the Court has an informed and objective opinion of the probable ultimate results if all these issues were litigated. The Court concludes that the issues are uncertain of resolution, that they are appropriate matters for compromise, and that the Plan's provisions give consideration to risks of litigation. Each affected class will receive, under the Plan, more than it would recover should the issues be decided adversely to that class, and less than it would receive should those issues be decided favorably to it. In each case, the distribution is well within the range of litigation possibilities.

■ Therefore, the Court finds that the Plan's intended distributions to the respective creditor classes satisfy the absolute priority rule through the compromises set forth in the Plan, are fair and equitable, are in the best interests of the debtor estate and its creditors, and constitute a fair and reasonable compromise of disputed issues of fact and law.

Pursuant to Section 197 of the Bankruptcy Act (11 U.S.C. § 597), the Plan divides the creditors into classes "according to the nature of their respective claims," as follows:

Class 1 —Tax Creditors
Class 2 —Wage Claimants
Class 3 —Secured Lessors
Class 4 —Secured Creditors—Revolving Credit Agreement
Class 4.1—Secured Creditors—Bankers Trust Company and Israel Discount Bank
Class 5 —Bankers Rescission Claimants
Class 6 —General Unsecured Unsubordinated Creditors
Class 6.1—General Unsecured Unsubordinated Creditors—Small Trade Creditors
Class 7 —Holders of Subordinated Debt Instruments
Class 8 —Fraud Claimants
Class 9 —Equitably Subordinated Claims.

■ The provisions in the Plan concerning four of the classes are not a subject of dispute and can be disposed of quickly. These classes and the amount of each of their claims, are as follows:

Class 1 —Tax Creditors ............ $250,000.00
Class 2 —Wage Claimants .......... 2,000.00
Class 3 —Secured Lessors .......... 53,167.58
Class 6.1—Small Trade Creditors ..... 106,500.00

Classes 1, 2, 3, and 6.1 will be paid in cash in full. Section 271 of the Bankruptcy Act (11 U.S.C. § 671) requires priority payments to Class 1. Because the amount is small, wage claimants in Class 2 are given priority even though Section 64(a) of the Bankruptcy Act [11 U.S.C. § 104(a)] is not applicable to Chapter X. [Bankruptcy Act § 102 (11 U.S.C. § 502)]. There is but one creditor in Class 3, a lessor who holds a certificate of deposit for $53,167.58 to secure performance of EFCA's head office lease. The Trustee rejected the lease, and the lessor is entitled to retain the deposit in partial compensation for damages. Full payment of small trade creditors, Class 6.1, is justified as a matter of administrative convenience.

■ Creditors in Class 9 are those whom the Court determines, in appropriate proceedings herein, are not entitled on equitable principles to participate on a parity with any of the other classes of creditors. Because the assets are insufficient to satisfy the claims of the other classes, creditors in Class 9 will receive nothing.

Numerous issues and sub-issues of fact and law govern the ranking of the remaining classes of creditors. This Memorandum would be unduly protracted if the Court

were to catalog the many legal authorities and evidentiary matters that bear on these issues. Accordingly, this Memorandum will set forth the issues, the contentions that can reasonably be made with respect to them, and the effect which an adverse or favorable resolution of those issues would have on the distribution to the affected creditor classes. While this Memorandum will not cite the authorities which support the various legal contentions, the Court notes that there is substantial authority, cited in counsels' briefs, for all of them, and that these disputed issues are legitimate subjects for debate.

### A. Creditors Class 4—Secured Creditors—Revolving Credit Agreement

█ Creditors in Class 4 consist of the banks that loaned money to EFCA pursuant to the Revolving Credit Agreement dated June 29, 1972. Under that agreement, the loans were to be secured by the pledge of all the stock of Bankers and Northern plus 60% of EFLIC's stock. If these Class 4 banks were fully secured, they would be entitled to recover $66.1 million as of March 31, 1976. This $66.1 million figure (which would be recoverable out of the security, if adequate) represents $50.5 million—the amount of debt before the April 3, 1973 offsets of EFCA's deposits—plus post-petition interest and fees of $15.6 million. The Plan provides for recovery by the Class 4 banks of cash and notes having a reasonable value of $42.8 million, which constitutes 64.8% of their maximum possible recovery. This contemplated recovery consists of:

Offsets of EFCA's April 3,
1973 Deposits . . . . . . . . . . . . . . . . . $ 7,953,719.14
Senior Secured Notes or Cash . . . . . . 15,000,000.00
Value of Senior Secured Income
Notes . . . . . . . . . . . . . . . . . . . . . . . 19,847,000.00
$42,800,719.14

The Class 4 banks have agreed to take this amount in compromise of disputes respecting the validity of their security interest in the stock of Bankers and Northern. As noted above, under the Revolving Credit Agreement, EFCA pledged 100% of the stock of Northern to the Class 4 banks. Through a bizarre series of events occurring in March of 1973, the Class 4 banks released their security interest in all but 20% of the Northern stock. The release was obtained by fraud on the part of officers of EFCA. Upon discovery of the fraud, and before April 5, 1973, the Class 4 banks took steps to rescind the release and to reinstate their security interest in full. In short, the issue is whether these efforts were successful, and, if so, whether the reinstatement of the security in these circumstances was a preference. The facts surrounding these events have been thoroughly investigated by the Trustee and are not in serious dispute. But as to the legal consequences of these events, there is a bona fide dispute. Those disputed legal issues have been exhaustively briefed by the interested parties whose briefs demonstrate that the authorities do not supply clear answers to the questions involved.

Under the Revolving Credit Agreement EFCA also pledged 100% of the stock of Bankers to the Class 4 banks. But that pledge is clouded because former shareholders of Bankers claim a right to rescind the transaction by which EFCA initially acquired the Bankers stock, and they further claim that this right to rescission is superior to the lien of the Class 4 banks. As noted below, whether the right of rescission survives Chapter X proceedings is disputed. Further, whether that right would be superior to the lien of the Class 4 banks turns on disputed questions of fact and law which have been thoroughly briefed by counsel.

In summary, the contentions are as follows: As part of the acquisition of Bankers, EFCA agreed in writing with the New York Insurance Department[15] that it would not pledge the Bankers stock without approval of the Department. That approval

---

15. EFCA needed the approval of the New York Department because Bankers owned EFNY, a New York based insurance company.

was not obtained when EFCA pledged the Bankers stock to the Class 4 banks. The question is whether the Class 4 banks are charged with knowledge of this agreement, and, if so, whether that knowledge subordinates their lien to the rescission claim of the former Bankers stockholders. The evidence on the factual issues is subject to conflicting inferences, and the questions of law are complex and open to bona fide dispute. If the claims of the former Bankers stockholders were upheld, the Class 4 banks would hold a security interest in but 30% [16] of the Bankers stock.[17]

Furthermore, the value of the Class 4 banks' security interest in Bankers stock is questionable. As noted below, Class 8 creditors assert a claim for fraud or Securities Acts violations against Bankers, which, if successful, would render Bankers stock valueless.

The validity of the Class 4 banks' security interest in 60% of the stock of EFLIC is undisputed. But that stock probably has no value.

As noted above, two days before the filing of the reorganization petition herein, the banks in Class 4 holding $7,953,719.14 in demand deposits of EFCA offset their claims under the Revolving Credit Agreement against those deposits. Although Section 68 of the Bankruptcy Act (11 U.S.C. § 108) expressly permits the set-off of mutual debts or credits, there remains the issue whether an offset may be effected within four months prior to a Chapter X proceeding.

To recapitulate, the claims of and provisions for the Class 4 banks are as follows:

| | |
|---|---|
| Amount offset on April 3, 1975 | $ 7,953,719.14 |
| Balance of principal | 42,581,969.05 |
| Total claim prior to offset | 50,535,688.19 |
| Post-petition interest and fees (approx.) | 15,600,000.00 |
| Total claim if fully secured | $66,135,688.19 |
| Value of recovery under the Plan | $42,800,000.00 |

If the Class 4 banks have a security interest in 100% of Northern and in 30% of Bankers, or in 100% of Bankers and 20% of Northern, then based on the reorganization value of those companies the banks would collect their full claim of $66.1 million, regardless of their offsets. Under these circumstances the value of the assets available for distribution to other creditors would be $23.3 million less than the recovery available under the Plan. Further, if the offsets are upheld, and if the banks' security interest in either Bankers or Northern is upheld, they will recover a total of either $59 million or $62.3 million.

The Class 4 banks would receive less than the Plan provides for them only if they should lose on all issues. This would occur if their offsets were held invalid, their security interest in Northern were held to be but 20%, and their security interest in Bankers were held to be 30% or valueless. Under these conditions, the banks would have a claim in Class 6 for $50,535,688.19 and, if they were to recover the same percentage as Class 6 recovers in the Plan, the banks would then get between $38.4 million and $40.4 million.

Since the issues affecting the Class 4 banks' security interest are open to debate

---

16. As noted below, the Trustee estimates that approximately 30% of the former Bankers shareholders may have sold the EFCA stock they received in the Bankers acquisition. Since those persons no longer have a rescission claim to assert, the lien of the Class 4 banks, absent other factors discussed herein, would be valid as to approximately 30% of the value of Bankers.

17. The Advisory Report at page 49 notes that if the failure to secure the approval of the New York Department defeats the pledge, the Trustee, as a perfected lien creditor under Section 70(c) of the Bankruptcy Act [11 U.S.C. § 110(c)], could defeat the security interest of the banks as to 100% of the stock and not just 70%. As the report also notes, the premise that the failure to secure approval defeats the pledge is tenuous.

and since the banks' recovery under the Plan is near the lower range of recovery from litigation, the settlement with the Class 4 banks is fair and equitable.

B. *Creditors Class 4.1—Secured Creditors—Bankers Trust Company and Israel Discount Bank*

■ Creditors in Class 4.1 hold notes of EFCA totaling $5,105,000, secured by a pledge of 40% of the stock of EFLIC. The validity of their security interest in the stock is undisputed. Thus, if the stock had sufficient value, the Class 4.1 creditors would be entitled to full recovery of principal, together with post-petition interest. Although EFLIC has been declared insolvent, the EFLIC Plan of Liquidation provides for certain distributions to the Trustee. The Trustee contends that these distributions are made to him as a creditor of EFLIC. The Class 4.1 creditors contend that these distributions are made to the Trustee as the stockholder of EFLIC, and that their security interest attaches to those distributions.

To settle these disputed issues, the Plan proposes to recognize the Class 4.1 creditors as secured to the extent of $350,000 out of their total claims of $5,105,000. The balance of their claims will be dealt with as unsecured claims in Class 6. The chances of Class 4.1 creditors boosting their claims to secured status are relatively small. Thus, the relatively small provision for them as secured creditors is in keeping with the litigation possibilities, and so the Plan in this respect is fair and equitable.

C. *Creditors Class 5—Bankers Rescission Claimants*

■ Creditors in Class 5 consist of persons who received EFCA stock in exchange for stock of Bankers upon its acquisition by EFCA and who continue to hold such stock. The Class 5 creditors claim the right to rescind EFCA's acquisition of Bankers stock and to reclaim their Bankers stock. This claim raises fundamental legal and policy considerations. The general rule is that a person defrauded of property is entitled to reclaim it, if he can trace it. If this rescission claim were upheld here, the former Bankers stockholders would regain possession of their Bankers stock or its equivalent value.

About 70% of the former Bankers stockholders still hold the EFCA stock which they received in exchange for their Bankers stock. Based on a reorganization value of Bankers of $51,121,000 as of March 31, 1976, the potential claims in this class would total $35,784,700.

Several arguments can be advanced against the Class 5 claimants. Specifically, those arguments are that the right of reclamation does not survive Chapter X proceedings, that the security interest of the Class 4 banks as bona fide pledgees cuts off the right of reclamation that the extension of credit by bona fide creditors in reliance on EFCA's ownership of Bankers cuts off the right of reclamation, and finally, that, in any event, the stock of Bankers is valueless because of fraud claims asserted against Bankers. If the rescission claims are defeated, creditors in Class 5 would rank with those in Class 8 and as such would at best, recover a fraction of their claims, and, at worst, recover nothing at all.

Given the seriousness of the claim asserted by creditors in Class 5, it is appropriate that the Plan make substantial provision for them. On the other hand, because of the arguments against the reclamation claim, it is appropriate that this claim not be recognized in full. The Plan allots to Class 5 a pool of 1,120,000 shares of stock of New Company, having a reorganization value of $12.3 million, or 34.4% of the maximum aggregate claim. Such distribution, in the light of the issues in controversy, is fair and equitable.

D. *Creditors Class 8—Fraud Claimants*

■ Class 8 is comprised of persons or entities who were damaged as a result of

their acquisition of securities issued or guaranteed by EFCA, whose claims do not fall within Classes 5, 6, or 7. Accordingly, Class 8 includes all present EFCA stockholders and those persons or entities who lost money from trading in EFCA stock or debt instruments. The amount of damages suffered by Class 8 creditors can only be estimated, but a reasonable figure is approximately $170 million.

Creditors in Class 8 raise a serious issue of law. They contend that they have claims against EFCA for common-law fraud and Securities Acts violations which should rank on a parity with the claims of general unsecured creditors. The Trustee has acknowledged that persons (other than those who had knowledge of the machinations within EFCA) who acquired EFCA securities over the years were the victims of fraud and Securities Acts violations. There is authority for the proposition that a fraud claim, even if based upon stock acquisition, is on a parity with general unsecured claims in a reorganization proceeding. Acceptance of this proposition would probably violate the expectations of all parties, because stockholders ordinarily are entitled to no recovery from an insolvent company. This bona fide issue has not been authoritatively resolved. If the claims of Class 8 creditors were ranked on a parity with the claims of general unsecured creditors, then Classes 5, 6, 7, and 8 would share equally in the assets available, resulting in a distribution of approximately 28 cents per dollar of claim for creditors in these classes.

Another factor affecting the position of Class 8 creditors is the existence of claims asserted by these creditors against EFCA's subsidiaries. These claims were first asserted in the Multi-District Actions. These subsidiaries were sued as aiders, abettors, or co-conspirators in the EFCA fraud. Under this theory, those who have claims against EFCA arising under common-law

fraud or Securities Acts violations also have claims against these subsidiaries. On March 5, 1975, this Court enjoined prosecution of those claims in the Multi-District Actions, pending these Chapter X proceedings, and required all those asserting such claims to do so in these Chapter X proceedings. *In re Equity Funding Corp. of America, supra* at 1276–77.[18] Following issuance of that preliminary injunction, claims were filed herein on behalf of defrauded EFCA securityholders, seeking recovery on the theory that Bankers, Northern, and other subsidiaries had participated in the EFCA fraud. Discovery was taken on the question of the implication of Bankers in the fraud, and memoranda on this issue were filed with the Court. While similar claims have been asserted with regard to other subsidiaries of EFCA, none of these other claims appears to have significant factual support.

If Bankers' implication in the fraud were successfully established, the value attributable to Bankers, *i. e.,* $51,121,000 as of March 31, 1976, would be proportionately distributed to all creditors who acquired securities of EFCA or extended credit to EFCA in reliance upon its fraudulent statements. Arguably, this group could include substantially all claimants in Classes 4, 4.1, 5, 6, 7, and 8, resulting in a distribution of 13.5 cents per dollar of claim. Furthermore, if Bankers were implicated in the EFCA fraud, the stock of Bankers would be rendered valueless. In that case, the rescission claims by the former Bankers stockholders and the security interest in the Bankers stock held by the Class 4 banks would likewise be rendered valueless.

If Class 8 creditors lose on the two disputed matters discussed above, they would receive nothing.

The Court therefore concludes that it is proper for the Plan to provide for a distri-

---

18. The injunction did not apply to claims of this nature which had been asserted against EFLIC, since these claims were compromised in the EFLIC liquidation proceedings in Illinois. *In re Equity Funding Corp. of America, supra* at 1277.

bution to Class 8 creditors. The Plan creates a pool of 1,900,000 New Company shares, having a reorganization value of $20,938,000, to be distributed among Class 8 claimants. While the amount of those claims cannot now be determined, a reasonable approximation is $170 million. Accordingly, based on New Company's reorganization value, Class 8 claimants would receive one share of stock for each $89.48 of adjusted loss, or 12.3 cents per dollar of claim. Since the amount of claims cannot be precisely predicted, each claimant may receive a greater recovery per dollar of claim if less than $170 million of Class 8 claims are allowed. Accordingly, the Plan puts a ceiling of 22 cents per dollar of claim on their recovery. The Court finds this compromise to be fair and equitable.

The Plan contains provisions for measuring the damages suffered by Class 8 claimants. The evidence shows that EFCA's fraudulent financial statements inflated the value of its stock for many years, but the existence of the EFCA fraud was unknown to the investing public and had no downward effect on market prices prior to the close of business on March 16, 1973. Accordingly, it is probable that losses experienced by investors in EFCA securities from fluctuations in its market price prior to that date were proximately caused by market conditions rather than the EFCA fraud. As a result, there is a substantial issue whether damages suffered before the close of business on March 16, 1973 would be recoverable in these Chapter X proceedings. In compromising that issue, the Plan recognizes such losses only to the extent of 20% thereof. The evidence shows that, following the close of business on March 16, 1973, rumors of the fraud caused a depressing effect upon the market and that the decline in market price after that time was proximately caused by the EFCA fraud. Therefore, the decline after that date is recognized in full in the Plan.

### E. *Creditors Classes 6 and 7—General Unsecured Unsubordinated Creditors and Holders of Subordinated Debt Instruments*

█ Class 6 creditors are the general unsecured, unsubordinated creditors of EFCA. Most claims in this class involve holders of notes and debentures issued or guaranteed by EFCA. Total allowed claims in this class approximate $44.4 million, including pre-petition interest.

Class 7 creditors are the holders of notes or debentures issued or guaranteed by EFCA which are, by their terms, subordinated to senior debt. The total amount of allowed claims in this class is approximately $64.2 million, including pre-petition interest.

The Plan provides for distribution of New Company stock to Class 6 creditors at the rate of one share of stock for every $14.50 of claims. In the aggregate, this amounts to approximately $33.8 million of stock. In addition, a cash distribution of up to $1.4 million may be made to Class 6.[19] Thus, the value of the distribution to Class 6 will vary from 76.1% to 80% of the total claims. Certain creditors in Class 6 are entitled to include pre-petition interest within their claims. The total recovery of such creditors, when measured against only the principal of their claims, will constitute a higher percentage. In the case of the 9½% Debentures, due 1990, the percentage ranges from 79.24% up to 83%.

Creditors in Class 7 will receive one share of New Company stock for each $35 of claims. This will total approximately $24.2 million of stock for a recovery of 31.5% of total claims allowed, including pre-petition interest.

Settlement of the claims of Classes 5 and 8 has a direct impact on the distributions that otherwise would be made to creditors in Classes 6 and 7. Each indenture under which the Class 7 debentures were issued

---

**19.** This cash is to come from any settlement with or judgment against the defendants in the Trustee's action against the persons who audit-

ed EFCA and its subsidiaries. *See* Part VI B, *infra.*

provides: (1) for their subordination in reorganization and (2) for payment to "senior" debt, as defined in said indentures, of anything of value that may be received by the holders of Class 7 debentures through reorganization, until senior debt has been paid in full. The portion of the indenture governing the 5½% EFCA Convertible Subordinated Debentures, due 1991 is set out in Appendix IV. This subordination provision is typical of those contained in the indentures that govern the other debt instruments in Class 7. Most of the debt in Class 6 is senior indebtedness, as that term is defined in these indentures. This Court in these proceedings is required to enforce the subordination provisions. *In re Credit Industrial Corp.,* 366 F.2d 402, 409 (2d Cir. 1966); *In re Associated Gas & Electric Co.,* 53 F.Supp. 107, 111 (S.D.N.Y.1943), *aff'd sub nom. Elias v. Clarke,* 143 F.2d 640 (2d Cir.), *cert. denied,* 323 U.S. 778, 65 S.Ct. 191, 89 L.Ed. 622 (1944); 6A W. Collier, *supra,* ¶ 9.10, at 219; 3A W. Collier, *supra* ¶ 65.-06[2], at 2299; Calligar, *Subordination Agreements,* 70 Yale L.J. 376, 383–92 (1961).

If no provision for settlements with Classes 5 and 8 were made, the assets available for distribution to Classes 6 and 7 would total about $87.2 million, even after providing for Classes 1, 2, 3, 4, and 4.1. Under these circumstances, Class 6 creditors would receive a distribution equal in reorganization value to the full amount of their claims—a total of $44.4 million. And creditors in Class 7 would receive the balance—a total of $42.8 million. Since claims in Class 7 total about $64.2 million, Class 7 would then receive a reorganization value distribution of 66.7 cents on the dollar.

However, if the claims in Classes 5 and 8 were successfully litigated, the impact on Classes 6 and 7 would be catastrophic. Of the $87.2 million otherwise available for Classes 6 and 7, $35.8 million would go to Class 5. The balance of $51.4 million would then be divided *pari passu* among the claims in Classes 6, 7, and 8. Under this *pari passu* division, Class 6 would receive $8.19 million and Class 7 would receive $11.84 million,[20] or 18.4% of their claims.

The Plan protects Classes 6 and 7 from such a division by providing for a settlement with Classes 5 and 8. To provide for this settlement, after giving full effect to the subordination provisions as between Classes 6 and 7, the reorganization value of the respective distributions to Classes 6 and 7 must then be reduced.

The reduction of the recovery by Classes 6 and 7 in the Plan is fair and reasonable. The amount diverted from Class 7 is larger, both proportionately and absolutely. This reduction is justified because if the claims in Class 5 succeed while claims in Class 8 fail, Class 6 would still be paid in full while Class 7 would receive little. On the other hand, the recovery by creditors in Class 6 should be reduced below 100 cents on the dollar for two reasons. First, as previously noted, successful litigation of the claims of Classes 5 and 8 would result in a drastic reduction in the recovery by Class 6. Second, as discussed above, Class 7 would probably receive some distribution, even if the claims of Classes 5 and 8 were successfully litigated. This factor distinguishes the present case from one where subordinated creditors would not be entitled to participate in the reorganization of the debtor under any possible result of litigation. *See Case v. Los Angeles Lumber Products Co., supra; In re Associated Gas & Electric Co., supra.*

**20.** If fraud claims were entitled to share *pari passu* with general creditor claims, as is assumed in this discussion, creditors in Class 7 might avoid the effect of the subordination provisions mentioned earlier by asserting tort claims for fraud or Securities Acts violations rather than contract claims based upon the terms of their debentures. Since such claims would not be based upon the applicable contractual terms, the recovery might not be subject to the restrictions contained in those contracts. Even if the subordination provisions were held applicable to a tort recovery by creditors in Class 7, so that such recovery was diverted to Class 6, Class 6's total recovery would still be less than the Plan provides.

Thus, the Plan makes provision for the settlements mentioned above and ensures that the distribution to Class 7 is free and clear of any further claims based upon the subordination agreements, since the agreements are fully recognized by the Plan.

### F. Recapitulation

To recapitulate, the following table shows the claims of creditors in each of the classes discussed above, the reasonable value of cash and notes that will be retained by or distributed to Class 4, the reorganization value of the stock that will be distributed to Classes 5, 6, 7, and 8 under the Plan, Class 6's additional potential cash recovery, the percentage of New Company that each of Classes 5, 6, 7, and 8 will own as a result of these distributions, and the percentage recovery of each class.

DISTRIBUTION UNDER THE PLAN [21]

| | No. of Shares | % of New Company | Value of Recovery in Millions | Amount of Claims in Millions | Percent Recovery |
|---|---|---|---|---|---|
| Class 4 ............ | — | — | $ 42.8 | $ 66.1 | 64.8 |
| Class 5 ............ | 1,120,000 | 14.1 | 12.3 | 35.8 | 34.4 |
| Class 6 ............ | 3,062,448 | 38.7 | 33.8 to 35.2 | 44.4 | 76.1 to 80 |
| Class 7 ............ | 1,834,812 | 23.2 | 20.2 | 64.2 | 31.5 |
| Class 8 ............ | 1,900,000 | 24.0 | 20.9 | 170.0 | 12.3 |
| | 7,917,260 | 100.0 | $130.0 | $380.5 | |

Reorganization value per share: $11.02

## VI. MISCELLANEOUS PROVISIONS OF THE PLAN

### A. Injunction Against Further Prosecution of Certain Claims and Payment of $250,000 Into Multi-District Action Court

█ The Plan contemplates dismissal of the Multi-District Actions against EFCA's subsidiaries (other than EFLIC) upon the entry of this Court's order making permanent its preliminary injunction dated April 11, 1975. In re Equity Funding Corp. of America, supra at 1276–77. Entry of such an order will expeditiously dispose of the Multi-District Actions against EFCA's subsidiaries. Accordingly, the order confirming the Plan will make the preliminary injunction permanent.

The injunction will prohibit EFCA securityholders and creditors from prosecuting EFCA's wholly-owned subsidiaries (other than EFLIC) in the Multi-District Actions or in any other proceedings, except these Chapter X proceedings for claims based upon the alleged participation by any such subsidiary as an aider, abettor, or co-conspirator in the EFCA fraud, if the subsidiary's participation was directed by an officer or employee of EFCA. This Court's Memorandum and Order dated April 11, 1975 sets forth the jurisdictional basis and the reasons for the issuance of the preliminary injunction. See In re Equity Funding Corp. of America, supra. A permanent injunction is justified by the factors and reasons set forth in that Memorandum and by provisions in the Plan made in compromise of claims based on alleged fraud and Securities Acts violations by EFCA and by EFCA's subsidiaries as well. These provisions consist of a pool of 1,900,000 shares for Class 8, a pool of 1,120,000 shares for Class 5, and paragraph 9.1 of the Plan, which provides for the payment of $250,000 by the Trustee into the registry of the Multi-District Action Court. This sum is to be used for the benefit of the plaintiff classes as may be defined by the Multi-District Action Court, in such manner as said Court may order.

---

21. Class 4.1 is omitted from this table, because the impact of the compromise with this class upon the recovery of other classes is de minimus.

### B. *Provisions Respecting Actions Against Accountants*

Paragraph 9.3 of the Plan deals with the Trustee's pending litigation against accounting firms that audited the books of EFCA and EFLIC. The Trustee's complaint alleges that these accountants failed to follow generally accepted auditing standards and were therefore negligent. The Trustee not only seeks to recover the fees paid to these accountants but also to recover from them the damages suffered by EFCA because of their failure to detect through audit the fraud perpetrated within EFCA and EFLIC. This litigation against the accountants has been consolidated in the Multi-District Actions.

Complaints filed by or on behalf of essentially all holders of EFCA securities are also pending in the Multi-District Actions against these same auditors. These complaints, which seek recovery of investment losses in EFCA securities, allege identical dereliction of duty by the auditors. The recovery sought in the Trustee's action and in the securityholders' actions is enormous, and could exceed the ability of the auditors to respond through insurance coverage or otherwise. Thus, the Trustee and EFCA securityholders are competing for the same recovery dollars in the Multi-District Actions against the accountants.

Paragraph 9.3 of the Plan eliminates that competition. It sets up a mechanism whereby any recovery in the Multi-District Actions from the accountant-defendants will be divided equally between the Trustee and a class or classes of plaintiffs who held EFCA stock and debentures on March 27, 1973, until the Trustee has recovered the sum of $2.4 million plus certain fees, advances and costs. Thereafter any recovery will be allocated entirely to the other plaintiffs.

This compromise is justified by two factors. First, there is a legal question whether the Trustee can recover from the accountant-defendants beyond the fees paid to them. Second, the Multi-District Action class plaintiffs who will benefit from the recovery are all creditors of EFCA in these proceedings; therefore, substantially the same group of plaintiffs will benefit (although in different proportions *inter se*) whether recovery from the accountants flows to the Trustee or to the class plaintiffs.

Paragraph 9.3 further provides that 7/12ths of all proceeds received by the Trustee pursuant to the compromise, other than reimbursement of fees, advances and costs, will be distributed to creditors in Class 6 in proportion to their claims. This is a portion of the total distribution to Class 6 creditors heretofore discussed and is justified for the reasons stated in part V.

### C. *Provision for Claims for Indemnity and Contribution*

The Plan provides for indemnity claims based upon charter or bylaw provisions of EFCA or upon state statutes. Under paragraph 2.7(vi) of the Plan, a claim for indemnity will be allowed in Class 6 only for legal and other expenses incurred in defending actions asserting fraud claims, and only if those actions terminate other than by settlement without a determination of liability for fraud on the part of the indemnity claimant. If a fraud claim is terminated by settlement, indemnity will be allowed only if approved by the Trustee with the consent of this Court. Fraud claims are defined as claims for damages or rescission based on violations of any federal or state securities laws, or on fraud, deceit, conspiracy, breach of warranty, or on any other breach of duty in connection with the acquisition of any EFCA security.

A pool of 50,000 shares is set aside for claims in this category, which will be paid at the rate of one share per $14.50 of allowed claim. No provision is made for claims based upon contribution. Two individuals who acted as accountants for EFCA and who are now defendants in the Multi-

District Actions have objected to paragraph 2.7(vi) because it fails to provide indemnity or contribution in the event of an adverse judgment.

The Court overrules those objections and finds that the provision respecting indemnity claims and the lack of provision for contribution claims are fair and equitable, for three reasons.

First, the plaintiffs in the Multi-District Actions are also EFCA's creditors who will receive the benefit of all EFCA's assets under the Plan. Thus, if EFCA is required to deliver assets by way of indemnity or contribution to unsuccessful fraud claimants in the Multi-District Actions, those assets must perforce be taken from the successful defrauded plaintiffs who are EFCA's creditors. Such a result would, in the final analysis, permit the indemnity or contribution claimants to benefit from their wrongful conduct—an unconscionable result. Looking at the other side of the coin, the use of EFCA's assets to reduce losses sustained by EFCA's defrauded investors, of necessity, reduces the amount of their fraud claims against the Multi-District Action defendants, which include the two objecting accountants. Thus, those accountants, who are indemnity and contribution claimants, benefit as much from the Plan as they would if indemnity and contribution were allowed.

Second, the policy of the securities laws precludes indemnification of an unsuccessful defendant in all except extraordinary circumstances such as the indemnification of a corporation by its officers or directors who caused it to engage in the conduct giving rise to the liability. *Globus v. Law Research Service, Inc.,* 418 F.2d 1276, 1288 (2d Cir. 1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970); *Thomas v.*

*Duralite Co.,* 386 F.Supp. 698 (D.N.J.1974). And this policy has been applied even where the liability of the party claiming indemnity is based upon negligence. *Gould v. American-Hawaiian Steamship Co.,* 387 F.Supp. 163 (D.Del.1974); *Odette v. Shearson, Hammill & Co.,* 394 F.Supp. 946 (S.D.N.Y.1975).

Third, Section 57(i) of the Bankruptcy Act [11 U.S.C. 93(i)] and Rule 304 of the Federal Rules of Bankruptcy Procedure, which are applicable in Chapter X proceedings, preclude contribution claims. *See* 3 W. Collier, *supra* ¶ 57.21. *See also Newport Air Park, Inc. v. United States,* 419 F.2d 342 (1st Cir. 1969); *Fidelity & Deposit Co. of Maryland v. Fitzgerald,* 272 F.2d 121, 128 (10th Cir. 1959); *Rowe v. John C. Motter Printing Press Co.,* 273 F.Supp. 363, 365 (D.R.I.1967).

## VII. CONCLUSION

Section 174 of the Bankruptcy Act (11 U.S.C. § 574) provides that an order shall be entered approving a Plan if, in the opinion of the Court, the Plan complies with the provisions of Section 216 of the Bankruptcy Act (11 U.S.C. § 616), and is fair and equitable, and feasible. For all of the reasons set forth in this Memorandum, the Court is of the opinion that the Trustee's Plan meets these criteria. Accordingly, the Court approves the Plan and orders it transmitted to the creditors of the estate for their acceptance or rejection, in accordance with the orders herein dated December 8, 1975.

This Memorandum shall constitute the Court's findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure and Rules 752, 914 and 10–901 of the Federal Rules of Bankruptcy Procedure.

Dated: December 8, 1975.

Appendices to follow.

## NEW COMPANY

## PROJECTED CASH FLOW

### (000's Omitted)

## CASH FLOW BY YEAR

| | 1976 | 1977 | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH SOURCES:** | | | | | | | | | | | | | |
| Dividends* from Insurance Subsidiaries | $2,512 | $2,413 | $2,980 | $3,494 | $3,955 | $4,422 | $4,852 | $5,566 | $6,118 | $6,530 | $6,530 | $6,530 | $6,530 |
| Start-up Loan | 2,000 | — | — | — | — | — | — | — | — | — | — | — | — |
| Proceeds from Sale of Cattle Group | — | — | 5,500 | — | — | — | — | — | — | — | — | — | — |
| Re-investment Income @ 7% | 227 | 381 | 505 | 436 | 349 | 337 | 342 | 374 | 406 | 498 | 712 | 953 | 1,222 |
| Cash from Non-Cash Assets | — | — | — | — | — | 671 | — | — | — | — | — | — | — |
| Total Sources | $4,739 | $2,794 | $8,985 | $3,930 | $4,304 | $5,430 | $5,194 | $5,940 | $6,524 | $7,028 | $7,242 | $7,483 | $7,752 |
| **CASH USES:** | | | | | | | | | | | | | |
| Senior Notes ($8,060 Issued): | | | | | | | | | | | | | |
| Principal | $ — | $ — | $5,500 | $ — | $ — | $ — | $ — | $ — | $2,560 | $ — | $ — | $ — | $ — |
| Interest | 666 | 887 | 394 | 230 | 230 | 230 | 230 | 230 | 115 | — | — | — | — |
| Income Notes ($27,582 Issued): | | | | | | | | | | | | | |
| Principal | — | — | — | 2,450 | 2,450 | 2,450 | 2,450 | 2,964 | 2,964 | 2,964 | 2,964 | 2,964 | 2,964 |
| Cash Interest | — | — | 1,449 | 1,803 | 1,631 | 1,459 | 1,287 | 1,088 | 880 | 675 | 468 | 260 | 52 |
| Interest Notes Paid | — | — | 579 | 772 | 772 | 772 | 772 | 193 | | | | | |
| Total Debt Service | $ 666 | $ 887 | $7,922 | $5,255 | $5,083 | $4,911 | $4,739 | $4,475 | $6,519 | $3,639 | $3,432 | $3,224 | $3,016 |
| Administrative Expenses | 150 | 220 | 242 | 266 | 293 | 322 | 354 | 389 | 429 | 472 | 519 | 571 | 628 |
| Total Uses | $ 816 | $1,107 | $8,164 | $5,521 | $5,376 | $5,233 | $5,093 | $4,864 | $6,948 | $4,111 | $3,951 | $3,795 | $3,644 |
| Excess (Deficit) Cash | $3,923 | $1,687 | $ 821 | ($1,591) | ($1,072) | $ 197 | $ 101 | $1,076 | $ (424) | $2,917 | $3,291 | $ 3,688 | $ 4,108 |
| Beginning Cash | $-0- | $3,923 | $5,610 | $6,431 | $4,840 | $3,768 | $3,965 | $4,066 | $5,142 | $4,718 | $7,635 | $10,926 | $14,614 |
| Add: Excess (Deficit) Cash | 3,923 | 1,687 | 821 | (1,591) | (1,072) | 197 | 101 | 1,076 | (424) | 2,917 | 3,291 | 3,688 | 4,108 |
| **ENDING CASH** | $3,923 | $5,610 | $6,431 | $4,840 | $3,768 | $3,965 | $4,066 | $5,142 | $4,718 | $7,635 | $10,926 | $14,614 | $18,722 |

* Based on 50% of the statutory earnings of Bankers and 50% of the statutory earnings of Northern.

APPENDIX II to follow.

## NEW COMPANY

## PROJECTED CONSOLIDATED EARNINGS (GAAP)

### (000's Omitted)

| | 1976 | 1977 | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 |
|---|---|---|---|---|---|---|---|---|
| **TOTAL LIFE INSURANCE SUBSIDIARIES** | | | | | | | | |
| Premium and Other Income | $ 52,831 | $ 58,783 | $ 66,448 | $ 74,169 | $ 82,101 | $ 90,043 | $ 97,956 | $106,650 |
| Investment Income | 20,524 | 23,077 | 25,949 | 28,975 | 32,154 | 35,489 | 38,964 | 42,618 |
| Total Income | $ 73,355 | $ 81,860 | $ 92,397 | $103,144 | $114,255 | $125,532 | $136,920 | $149,268 |
| Provision for Benefit of Policyholders | $ 45,625 | $ 51,042 | $ 57,685 | $ 64,546 | $ 72,008 | $ 79,568 | $ 86,727 | $ 95,094 |
| Expenses | 12,798 | 12,952 | 14,585 | 16,491 | 18,266 | 20,003 | 22,094 | 24,069 |
| Total Deductions | $ 58,423 | $ 63,994 | $ 72,270 | $ 81,037 | $ 90,274 | $ 99,571 | $108,821 | $119,163 |
| Federal Income Tax | $ 2,697 | $ 3,896 | $ 4,798 | $ 5,662 | $ 6,142 | $ 6,824 | $ 7,382 | $ 8,063 |
| Net Income Before Allocation To Policyholders Surplus | $ 12,235 | $ 13,970 | $ 15,329 | $ 16,445 | $ 17,839 | $ 19,137 | $ 20,717 | $ 22,042 |
| Provision for Policyholders Share of Participating Earnings | $ 2,359 | $ 2,570 | $ 2,687 | $ 2,765 | $ 2,840 | $ 2,921 | $ 2,941 | $ 2,977 |
| Net Income of Life Insurance Subsidiaries | $ 9,876 | $ 11,400 | $ 12,642 | $ 13,680 | $ 14,999 | $ 16,216 | $ 17,776 | $ 19,065 |
| **PARENT COMPANY** | | | | | | | | |
| Investment Income | $ 227 | $ 381 | $ 505 | $ 436 | $ 349 | $ 337 | $ 342 | $ 374 |
| Interest Expense-Income Notes | 1,448 | 1,931 | 1,931 | 1,802 | 1,631 | 1,459 | 1,287 | 1,089 |
| Amortization of Discount-Income Notes | 393 | 791 | 1,072 | 1,037 | 941 | 835 | 714 | 577 |
| Interest Expense-Senior Notes | 666 | 887 | 394 | 230 | 230 | 230 | 230 | 230 |
| Administration Expense | 150 | 220 | 242 | 266 | 293 | 322 | 354 | 389 |
| CONSOLIDATED EARNINGS | $ 7,446 | $ 7,952 | $ 9,508 | $ 10,781 | $ 12,253 | $ 13,707 | $ 15,533 | $ 17,154 |

APPENDIX III to follow.

APPENDIX III

# NEW COMPANY
## Reorganization Value at March 31, 1976
### (000's Omitted)

## ASSETS

| | |
|---|---:|
| Cash | $ 2,000 |
| Bankers | 51,121 |
| Northern | 54,315 |
| Securities Group | 1,575 |
| Cattle Group | 5,500 |
| Non Cash Assets | 671 |
| Contingent Assets | —0— |
| Total Assets | $115,182 |

## LIABILITIES AND STOCKHOLDERS' EQUITY

**Debt**

| | | |
|---|---:|---:|
| Senior Notes | | $ 8,060 |
| Income Notes | | |
| Face Amount | $ 27,582 | |
| Less Unamortized Debt Discount | 7,735 | 19,847 |
| Total Debt | | $ 27,907 |

**Equity**

| | | |
|---|---:|---:|
| Common Stock | | |
| Authorized 9,000,000 | | |
| Estimated to be Issued and | | |
| Outstanding | 7,917,260 | 87,275 |
| | | $115,182 |

APPENDIX IV to follow.

## APPENDIX IV

The Indenture governing the 5½% Convertible Subordinated Debentures due 1991, provides in pertinent part:

## "ARTICLE THIRTEEN

## "SUBORDINATION OF DEBENTURES

"**Section 1301.** *Agreement of Subordination.*

"The Company covenants and agrees, and each Holder of Debentures issued hereunder by his acceptance thereof likewise covenants and agrees, that all Debentures shall be issued subject to the provisions of this Article Thirteen; and each Person holding any Debenture, whether upon original issue or upon transfer or assignment thereof, accepts and agrees to be bound by such provisions.

"All Debentures issued hereunder shall, to the extent and in the manner hereinafter set forth, be subordinated and subject in right of payment to the prior payment in full of all Superior Indebtedness.

"**Section 1302.** *Payments to Debentureholders.*

"Upon any acceleration of the principal of the Debentures or any payment by the Company, or distribution of assets of the Company of any kind or character, whether in cash, property or securities, to creditors upon any dissolution or winding-up or total or partial liquidation or reorganization of the Company, whether voluntary or involuntary or in bankruptcy, insolvency, receivership or other proceedings, all amounts due or to become due upon all Superior Indebtedness shall first be paid in full, or payment thereof provided for in money or money's worth in accordance with its terms, before any payment is made on account of the principal (and premium, if any) or interest of the Debentures . . .; and upon any such dissolution or winding-up or liquidation or reorganization any payment by the Company, or distribution of assets of the Company of any kind or character, whether in cash, property or securities, to which the Holders of the Debentures or the Trustee would be entitled, except for the provisions of this Article Thirteen, shall be paid by the Company or by any receiver, trustee in bankruptcy, liquidating trustee, agent or other Person making such payment or distribution directly to the holders of Superior Indebtedness (pro rata to such holders on the basis of the respective amounts of Superior Indebtedness held by such holders) or their representative or representatives, or to the trustee or trustees under any indenture pursuant to which any instruments evidencing any Superior Indebtedness may have been issued, as their respective interests may appear, to the extent necessary to pay all Superior Indebtedness in full, in money or money's worth in accordance with its terms, after giving effect to any concurrent payment or distribution to or for the holders of Superior Indebtedness, before any payment or distribution is made in respect of the Debentures to the Holders of the Debentures or to the Trustee.

"In the event that, notwithstanding the foregoing, any payment by or distribution of assets of the Company of any kind or character, whether in cash, property or securities, prohibited by the foregoing, shall be received by the Trustee or the Holders of the Debentures before all Superior Indebtedness is paid in full, or provision is made for such payment in money or money's worth in accordance with its terms, such payment or distribution shall be paid over or delivered to the holders of Superior Indebtedness or their representative or representatives, or to the trustee or trustees under any indenture pursuant to which any instruments evidencing any Superior Indebtedness may have been issued, as their respective interests may appear, for application to the payment of all Superior Indebtedness remaining unpaid to the extent necessary to pay all Superior Indebtedness in full in money or money's worth in accordance with its terms, after giving effect to any concurrent payment or distribution to or for the holders of such Superior Indebtedness."